JOSÉ MANUEL CALO MORALES, demandante y recurrente, *v.* MARITZA CARTAGENA CALO ET AL., demandados y recurridos.

*Número:* 0-84-505 *Resuelto:* 28 de junio de 1991

104

*Antonio Cajigas Llamas*, abogado del recurrente; los recurridos no comparecieron.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

Hoy resolvemos si los términos dispuestos en el Art. 117 del Código Civil, 31 L.P.R.A. sec. 465 (para que el esposo impugne la presunción de legitimidad de los hijos nacidos, vigente el matrimonio, Art. 113 del Código Civil, 31 L.P.R.A. sec. 461), infringen los preceptos constitucionales que garantizan la dignidad del ser humano, Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1; el debido proceso de ley, Const. E.L.A., *supra*, Sec. 7, y la igual protección de las leyes, Const. E.L.A., *supra*, Sec. 7, respectivamente. Esta controversia es una consecuencia lógica del derecho reconocido al esposo, en *Moreno Álamo v. Moreno Jiménez*, 112 D.P.R. 376, 387 (1982), de presentar cualesquiera otras pruebas de carácter idóneo o concluyente, además de la prueba sobre inaccesibilidad física del marido hacia su mujer, para probar su imposibilidad de paternidad sobre el hijo. Allí abrimos las puertas de los tribunales a la evidencia científica traída por el esposo para destruir la presunción de legitimidad de los hijos nacidos, vigente el matrimonio, dispuesta en el Art. 116 del Código Civil, 31 L.P.R.A. sec. 464. Nada expresamos (por no estar presente en aquel caso) sobre el término para presentar la acción de impugnación de legitimidad y la prueba para sustentarla. Esa es nuestra tarea ante la situación fáctica de autos.

# I

El 9 de junio de 1973 el Sr. José Manuel Calo Morales (el recurrente) contrajo matrimonio con la Sra. Maritza Cartagena Calo (la recurrida) en Carolina, Puerto Rico. Vigente el matrimonio, nacieron tres (3) hijos de nombres, Catherine (nacida el 7 de agosto de 1974); Alexie (nacido el 12 de septiembre de 1976), y José María *(nacido el 30 de enero de 1981* y codemandado y recurrido en este pleito). José María fue inscrito en el Registro Demográfico *por ambos padres, en 1981.*([1])

El *5 de julio de 1983* el recurrente presentó una demanda de divorcio, predicada en la causal de adulterio, en contra de la recurrida. Alegó que vigente el matrimonio sólo nacieron dos (2) hijos (Alexie y Catherine). Adujo que la recurrida estaba viviendo, desde hace algún tiempo, con el Sr. José Antonio Calo (tío del recurrente) en público concubinato, a pesar de estar legalmente casada con el recurrente.

*El 20 de septiembre de 1983* el recurrente presentó un pleito independiente de impugnación de paternidad del tercer niño (José María), alegando que advino en conocimiento de que la recurrida "ha admitido a diversas personas que el padre del menor lo es el codemandado José Antonio Calo Ramírez", por lo que "tiene fundados motivos para negar la paternidad ... de dicho menor". Apéndice, pág. 5.

■ Consolidados([2]) ambos pleitos, el foro de instancia

---

([1]) De los autos no surge la fecha específica en que fue inscrito su nacimiento en el Registro Demográfico. En vista de la legislación vigente sobre la inscripción de los nacimientos, 24 L.P.R.A. sec. 1131 *et seq.*, presumimos que se inscribió su nacimiento a los diez (10) días de haber ocurrido.

([2]) *Cf.* Regla 38.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Cestero v. Pérez de Jesús*, 104 D.P.R. 891 (1976). No alcanzamos a comprender el porqué del foro de instancia consolidar estos recursos. Las consideraciones prácticas de conveniencia y de prudencia aconsejan que en pleitos de divorcio por causales culposas no se le añada el ingrediente disociador de un pleito de impugnación de legitimidad de los

concedió un término a los recurridos para contestar ambas demandas.

Sin que los recurridos hubieran contestado, el recurrente solicitó al foro de instancia que ordenara a las partes realizarse los análisis de sangre para determinar la exclusión de paternidad. Señalado el caso para la discusión de la impugnación de paternidad, el foro de instancia decretó, *sua sponte* y en corte abierta, que:

> Examinado el Código Civil el Tribunal interpreta que esta acción está prescrita (sic). Apéndice, pág. 2.

Contra esa determinación, fundamentada en el Art. 117 del Código Civil, *supra*, acude el recurrente ante nos.

Expedido el auto, compareció el peticionario. Los recurridos no han comparecido dentro del término reglamentario. Resolvemos.

## II

Ante nos, el recurrente alega que incidió el foro de instancia al no proteger y garantizarle sus derechos constitucionales a la inviolabilidad de su dignidad, Const. E.L.A., *supra*, Sec. 1; a la igual protección de las leyes, Const. E.L.A., *supra*, Sec. 7, y el debido proceso de ley procesal, Const. E.L.A., *supra*, Sec. 7, respectivamente.

De su primer señalamiento de error colegimos que el recurrente sostiene que el término del Art. 117 del Código Civil, *supra*, viola su derecho a un debido proceso de ley al no permitirle presentar —luego de transcurrido dicho término— una prueba científica para impugnar la paternidad legítima, aun cuando es después de transcurrido el término que "despierta a una triste realidad, de haberse visto

---

hijos. Bastante encono trae el pleito de divorcio. Estos pleitos deben verse por separado.

engañado por su compañera [y] toma conocimiento de lo acontecido y acude a los tribunales en la búsqueda de una solución a su recién descubierto problema". Solicitud de revisión, págs. 3–4.

En su tercer[3] señalamiento de error aduce que negarle al marido la búsqueda de la verdad sobre la filiación de su presunto hijo es imponerle una paternidad ficticia que viola la dignidad del ser humano. Además, sostiene que el Art. 117 del Código Civil, *supra,* viola la igual protección de las leyes, ya que al hijo se le reconoce un término más amplio para impugnar su legitimidad, teniendo el marido igual derecho cuando se le quiera imponer un hijo. No le asiste la razón. Veamos.

## III

En *Moreno Álamo v. Moreno Jiménez,* supra, págs. 377–378, expresamos que "la norma legal no es enemiga —o no debe serlo— de la verdad científica. Son entera y perfectamente reconciliables". Al así expresarnos, reconocimos que "[i]ndudablemente, el Derecho se empeña en apoyar la paternidad jurídica en la biológica y hace los máximos esfuerzos porque ambos conceptos concuerden" —A.R. Calderón, Jr., *La Filiación en Puerto Rico,* 1ra ed., Ed. Rev. C. Abo. P.R., 1963, págs. 5–6— y que "[e]s regla evidente de la Biología que cada hijo tiene, necesariamente, un padre y una madre [pero] '[p]ara el Derecho, sin embargo, puede carecer de uno de ellos o de los dos, porque la procreación es un hecho productor de efectos jurídicos, pero entre estos efectos no está siempre (sino cuando concurren ciertas circunstancias) la atribución de un estado de filiación' ". (Escolio omitido.) Calderón, *op. cit.,* pág. 5. Véase J. Puig Brutau,

---

[3] En su segundo señalamiento de error el recurrente sostiene que el Art. 116 del Código Civil, 32 L.P.R.A. sec. 464, es el aplicable a este caso. Tal señalamiento resulta inmeritorio, ya que dicho artículo no regula el término para instar una acción de impugnación de paternidad legítima como la de este caso.

*Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1985, T. IV, pág. 215.

Según Díez-Picazo y Gullón, "[l]a filiación no es, pues, necesariamente una situación derivada de un hecho biológico. De algún modo puede decirse que una cosa es ser padre y otra cosa ser progenitor. ... Padre y progenitor no son sinónimos. Padre contiene una carga de sentido socio-cultural y jurídico de la que carece el término progenitor". L. Díez-Picazo y A. Gullón Ponce de León, *Sistema de Derecho Civil*, 3ra ed. rev., Madrid, Ed. Tecnos, 1983, T. IV, pág. 314. "Y así, [señala Rivero Hernández] hay progenitores no 'padres' (jurídicamente), y 'padres' para el Derecho que no son progenitores." (Escolio omitido.) F. Rivero Hernández, *La Presunción de Paternidad Legítima*, Madrid, Ed. Tecnos, 1971, pág. 28.[4]

De lo anterior se desprende que no siempre existe la deseada correlación exacta entre la paternidad jurídica y la biológica. Calderón, *op. cit.* Ello se debe a que muchas veces "[l]a verdad biológica encuentra sus barreras, que proceden de prescripciones sociales profundamente arraigadas que no se ha considerado procedente romper del todo". Díez-Picazo y Gullón, *op. cit.*, pág. 314.

Sabido es que "[l]a procreación es de fácil determinación respecto de la madre, probado el hecho del parto y la identidad del hijo .... La identidad del padre, sin embargo, no es de tan sencilla solución", *Almodóvar v. Méndez Román*,

---

[4] Este autor añade, citando a Cicu, *La Filiación*, que: "No hay coincidencia plena entre el hecho natural de la filiación y la relación jurídica de filiación. La procreación no siempre da lugar a una relación jurídica de filiación. Hay personas que no tienen o no pueden tener progenitores jurídicamente reconocidos como tales. Incluso en casos en que la filiación es reconocida por la Ley, la relación jurídica no es siempre idéntica. Se puede, en fin, tener una relación de filiación faltando sin embargo por completo el hecho natural." Eso ocurre, por ejemplo, en la adopción. F. Rivero Hernández, *La Presunción de Paternidad Legítima*, Madrid, Ed. Tecnos, 1971, pág. 28 esc. 2.

125 D.P.R. 218, 235 (1990);([5]) *Ramos v. Marrero*, 116 D.P.R. 357, 360 (1985), porque —como afirma Royo Martínez— "una prueba positiva que acredite que el marido fue padre de la criatura y que sólo él de entre todos los hombres de la tierra pudo ser el padre, es un privilegio del que únicamente gozó Adán". M. Royo Martínez, *Derecho de Familia*, Sevilla, 1949, pág. 238.([6])

La duda del esposo en cuanto a la paternidad sobre los hijos de su esposa es tan vieja como el hombre mismo. La forma en que los distintos pueblos intentaron disipar tal duda fue variada. Históricamente, nos dice Rivera Hernández, "sólo en pueblos y etapas de cultura jurídica relativamente avanzada fue posible una verdadera y propia impugnación de la paternidad. En épocas anteriores y en sociedades si no primitivas al menos jurídicamente poco desarrolladas, en las que la relación paternofilial se caracterizaba por un acusado poder, a veces quasi-dominical, del *pater* sobre el hijo —poder que llegaba incluso al 'ius vitae ac necis' [derecho a quitarle la vida al recién nacido]— no era preciso el ejercicio de ninguna acción judicial ni proce-

---

([5]) Por ello, las disposiciones del Talmud hebreo impedían a los hijos acompañar el cadáver del marido (su alegado padre) al cementerio, y no en cambio, al de la madre, porque según advierten "tu estás seguro de que es tu madre, pero no estás seguro de que es tu padre". Rivero Hernández, *op. cit.*

Nuestros indios taínos tenían establecido que el sucesor del cacique sería su hermano o hermana, o en ausencia de éstos, el hijo o la hija de cualquiera de sus hermanas, ya que sólo así tenían certeza de que el sucesor llevaba la sangre del cacique. Véase B.G. Silvestrini y M.D. Luque de Sánchez, *Historia de Puerto Rico: trayectoria de un pueblo*, 1ra ed., San Juan, Ed. Cultural Puertorriqueña, 1987, pág. 62; L. Figueroa, *Breve Historia de Puerto Rico*, Ed. Las Américas, 1962, pág. 65; I. Abad y LaSierra, *Historia geográfica civil y notarial de la isla de San Juan Bautista*, Ed. Universitaria de Puerto Rico, 1959, pág. 22.

([6]) Hoy día esta aseveración de Royo Martínez no es del todo exacta, pues con las pruebas hematológicas y de DNA se puede determinar con gran certeza y exactitud quién es el padre de una criatura. Véanse: *Ortiz v. Peña*, 108 D.P.R. 458 (1979); Verruno y Hass, *Manual para la investigación de la filiación: actualización médico-legal: sistema HLA, proteínas, enzimas, probabilidad e índice de paternidad, prueba de compatibilidad inmunogenética*, Buenos Aires, Ed. Abeledo-Perrot, 1985; A. Rodríguez Trinidad, *La sangre habla: las pruebas de exclusión de paternidad*, 1 (Núm. 3) Forum 3 (1985); Joint AMA–ABA Guidelines: *Present Status of Serologic Testing in Problems of Disputed Parentage*, 10 (Núm. 1) Fam. L.Q. 247 (1976); Laboratorio de Histocompatibilidad del Recinto de Ciencias Médicas U.P.R., *Pruebas DNA*, (mimeo).

dimiento alguno para negar el marido su paternidad sobre el hijo nacido en matrimonio: bastábale rechazar el recién nacido, negarle la entrada en su círculo familiar, exponerlo, abandonarlo". Rivero Hernández, *op. cit.*, pág. 395.

Así, en los pueblos medio-orientales, indoeuropeos y los griegos, la determinación de la paternidad quedaba supeditada a la voluntad del esposo, jefe de la familia, quien en un acto religioso (*tollere*) debía recoger del suelo[7] al recién nacido para que éste ingresara a la familia. El abandono o la exposición (*non tollere*) significaría la impugnación de la paternidad sobre el hijo en muchos casos. Rivero Hernández, *op. cit.*, pág. 395. Esta forma de impugnar respondía a una concepción de dominio, no sobre el hijo, sino sobre la esposa.

En el derecho romano primitivo imperó la norma del exclusivo arbitrio del esposo (*tollere liberum*). A medida que la concepción de dominio sobre la esposa fue perdiendo justificación, en el derecho romano se le exigía al marido que recurriese al magistrado para poder rechazar al hijo adulterino. Para ello se instituyó la acción procesal oportuna del *praeiudicium an filius sit* como medio de constatación del *status* del nacido de la esposa.

En los pueblos germánicos, en su primera etapa histórica, imperaba el exclusivo arbitrio del esposo para resolver las dudas sobre su paternidad. Así por ejemplo, los galos resolvían las cuestiones de la paternidad legítima o adulterina tirando al niño a las aguas del Rhin: si flotaba era tenido por legítimo y si se hundía, por adulterino.

Superadas estas etapas históricas, en la Edad Media, así como en el Derecho Común (*Common Law*) y los cuerpos legales históricos del Derecho español (Las Partidas, las Leyes de Toro y las Leyes de Matrimonio Civil de 1851 y 1870) se reguló el procedimiento judicial para impugnar

---

[7] El contacto del recién nacido con la tierra se relacionaba con la antigua creencia o mito de la maternidad de la madre tierra.

la legitimidad del hijo nacido vigente el matrimonio. Se imponía así, el procedimiento judicial para proteger a los hijos del rechazo o del abandono arbitrario por parte del esposo.

## IV

El alcance de la impugnación de la paternidad del marido guarda una estrecha relación con la prelación que se asigne a la presunción de paternidad del marido sobre los hijos nacidos vigente el matrimonio. Así, el establecimiento de un sistema cerradísimo de impugnación se caracteriza por una fuerte presunción de paternidad del marido sobre los hijos de su esposa, que limita las causas de impugnación, *Moreno Álamo v. Moreno Jiménez*, supra, las personas con capacidad para impugnar, *Ramos v. Moreno*, supra, y el término para ejercitar la acción.

Ello impone la reflexión sobre la naturaleza del sistema de impugnación de legitimidad de los hijos que impera en Puerto Rico.

## V

*Naturaleza de nuestro sistema de impugnación de la presunción de paternidad legítima*

■ El Art. 113 de nuestro Código Civil, 31 L.P.R.A. sec. 461, establece la presunción de paternidad del marido de todo hijo nacido vigente el matrimonio o antes de los trescientos (300) días siguientes a su disolución. Fundamentado en la máxima pauliana de *pater is est quem iustae nuptiae demonstrant* y en los conocimientos científicos de los redactores del código napoleónico sobre la duración del embarazo, nuestro Art. 113 del Código Civil, *supra*, dispone:

Son hijos legítimos los nacidos después de los ciento ochenta días siguientes al de la celebración del matrimonio y antes de los trescientos días siguientes a su disolución.

Contra esta legitimidad no se admitirá otra prueba que la imposibilidad física del marido para tener acceso con su mujer en los primeros ciento veinte días de los trescientos que hubiesen precedido al nacimiento del hijo.

El Art. 116 del Código Civil, *supra*, establece cuáles personas poseen la capacidad para impugnar tal presunción, según la codificación del siglo XIX, dispone:

*Sec. 464. Quiénes pueden impugnar la legitimidad*

La legitimidad puede ser impugnada solamente por el marido o sus legítimos herederos. Estos sólo podrán impugnar la legitimidad del hijo en los casos siguientes:

(1) Si el marido hubiese fallecido antes de transcurrir el plazo señalado para deducir su acción. en juicio.

(2) Si muriese después de presentada la demanda sin haber desistido de ella.

(3) Si el hijo nació después de la muerte del marido.

Finalmente, el Art. 117 del Código Civil, *supra*, dispone el término para ejercitar la acción de impugnación. Proveniente de los Proyectos de las Leyes de Matrimonio civil españolas de 1851 y 1882, así como del Art. 113 del Código Civil español, el Art. 117 de nuestro Código Civil, *supra*, prescribe:

La acción para impugnar la legitimidad del hijo deberá ejercitarse dentro de los *tres meses siguientes a la inscripción del nacimiento en el registro si el marido se hallare en Puerto Rico, y de los seis meses si estuviere fuera de Puerto Rico*, a contar desde que tuvo conocimiento del nacimiento. (Énfasis suplido.)

■ Como vimos, el Art. 113 de nuestro Código Civil, *supra*, establece una presunción[8] de legitimidad de "los

---

[8] La presunción permite inferir la *legitimidad* de los hijos, probado (a) el hecho del matrimonio y el nacimiento del hijo después de los ciento ochenta (180) días del matrimonio, y (b) el nacimiento del hijo antes de los trescientos (300) días siguientes a la disolución del matrimonio. "Legitimidad" en este contexto significa que se le puede imputar la paternidad del hijo nacido, bajo estas circunstancias, al marido. De

[hijos] nacidos después de los ciento ochenta días siguientes al de *la celebración del matrimonio* y antes de los trescientos días siguientes a su disolución". (Énfasis suplido.) Esta es una presunción controvertible, esto es, la parte afectada por la presunción puede presentar evidencia para refutar o rebatir el hecho presumido, dejando abierta la posibilidad de que el juzgador no infiera tal hecho. E.L. Chiesa, *Sobre la validez constitucional de las presunciones*, XIV (Núm. 3) Rev. Jur. U.I.A. 727 (1980). La presunción establecida en este artículo responde a consideraciones de política pública. *Moreno Álamo v. Moreno Jiménez*, supra. El permitir inferir la paternidad de los hijos nacidos ciento ochenta (180) días después de vigente el matrimonio y antes de los trescientos (300) días siguientes a su disolución, protege la institución del matrimonio, la paz familiar y la estabilidad en el *status* de los hijos. Véase *Michael H. v. Gerald D.*, 105 L.Ed.2d 91, 491 U.S. 110 (1989).

Nuestra jurisprudencia ha variado, siguiendo el compás de los tiempos, la naturaleza del sistema de impugnación de la paternidad legítima.

En *Ramos v. Marrero*, supra, pág. 358, expresamos que "[e]n materia de filiación el Derecho puertorriqueño ha ido abriendo camino a través de la enmarañada jungla de prejuicios y convencionalismos sociales y tecnicismos de ley para hacer que brille la verdad y se reconozca a todos los fines legales la relación biológica entre padres e hijos".

Así, en *Moreno Álamo v. Moreno Jiménez*, supra, ampliamos las causas para impugnar la paternidad del marido. Art. 113 del Código Civil, *supra*. Además de la imposibilidad física del marido para tener acceso a su esposa,

---

ahí que la presunción sólo opera a favor de las personas casadas legalmente. Adviértase que este artículo está situado en la parte VI del Subtítulo 1 sobre las personas y luego de la regulación del matrimonio. Véase, además, el Art. 116 del Código Civil, *supra*.

La razón fundamental por la cual se establece una presunción es la probabilidad. Es decir, establecido el hecho básico resulta altamente probable el hecho presumido.

dimos paso a cualquier otra prueba —de carácter idóneo y concluyente— sobre la imposibilidad de paternidad del marido. En especial, dimos gran peso a la evidencia científica de no paternidad en *Ortiz v. Peña*, 108 D.P.R. 458 (1979), y le habíamos reconocido la confiabilidad o certeza que la ciencia le atribuye. Atemperamos así nuestro sistema de causales para impugnar la paternidad del marido a nuestro diseño constitucional, haciéndolo menos restrictivo que su interpretación y aplicación literal.

■ En *Ramos v. Marrero*, supra, atendimos el aspecto de las personas con capacidad para impugnar la presunción de paternidad del marido. Art. 116 del Código Civil, *supra*. Además del marido y sus legítimos herederos, resolvimos que el progenitor extramatrimonial podía impugnar la presunción de paternidad del marido. Ya en *Agosto v. Javierre*, 77 D.P.R. 471 (1954), habíamos reconocido que el hijo, fruto de las relaciones extramatrimoniales de una mujer casada, podía llevar una acción filiatoria contra su progenitor al amparo de la Ley Núm. 229 de 12 de mayo de 1942 (31 L.P.R.A. secs. 501–503), aun cuando indirectamente impugnaba la presunción de paternidad del marido.

Posteriormente, en *Robles López v. Guevárez Santos*, 109 D.P.R. 563 (1980), reconocimos que la esposa, en representación del hijo, puede instar una acción criminal por incumplimiento de obligación alimentaria, Art. 158 del Código Penal, 33 L.P.R.A. sec. 4241, contra el progenitor, aun cuando implícitamente está impugnando la presunción de paternidad del marido (al tener que establecer la verdadera filiación del menor para cobrarle alimentos al progenitor).

Así que, bajo nuestro estado de derecho vigente, directa o indirectamente, tienen capacidad para impugnar la presunción de legitimidad: el marido, sus herederos (en las circunstancias señaladas en el Art. 116 del Código Civil, *supra*), el hijo o la esposa en representación del hijo menor de edad, y el progenitor o padre biológico.

■ Finalmente, en *Santiago Ojeda v. Cruz Maldonado*, 109 D.P.R. 143, 146 (1979), resolvimos que los plazos dispuestos en el Art. 117 del Código Civil, *supra*, para instar la acción de impugnación de paternidad legítima no son de prescripción *sino de caducidad*, apreciable de oficio por el tribunal. Véanse, además: S. de 5 de marzo de 1963, XXX (Vol. I) Repertorio de Jurisprudencia 1627; Puig Brutau, *op. cit.*, pág. 41. En consecuencia, el término así dispuesto sólo puede ejecutarse mediante la acción de contestación de estado dentro del término.

Apenas se reflexione sobre la naturaleza de nuestro sistema de impugnación de la presunción de paternidad legítima, podrá observarse el cambio (reflejado en nuestra jurisprudencia) de un sistema legislativo cerradísimo para la impugnación de paternidad, a uno más flexible y abierto a los adelantos científicos y a las corrientes constitucionales modernas en aspectos de filiación. La apertura a nuevas causales y el reconocimiento de la capacidad para cuestionar la presunción de paternidad legítima al padre biológico y al propio hijo son vivos ejemplos de ello.

No debe sorprendernos, por lo tanto, el cuestionamiento a la limitación del término para ejercitar la acción.

Con este marco de referencia sobre la naturaleza de nuestro sistema de impugnación, pasamos a examinar la naturaleza, justificación y constitucionalidad de los términos para instar la acción de impugnación de la presunción de paternidad legítima. Art. 117 del Código Civil, *supra*.

## VI

*Naturaleza del término dispuesto en el Art. 117 del Código Civil*

■ Debemos comenzar señalando que existe una diferencia entre el término de las acciones para establecer la filiación de un hijo y el dispuesto para impugnar la pater-

nidad del marido. Esa diferencia se justifica por los propósitos de una y otra acción.

Como regla general, las acciones de filiación son imprescriptibles, toda vez que van dirigidas a establecer el *status* y el derecho de personalidad de los hijos. Como señala el profesor Guaroa Velázquez:

> La filiación no supone una relación entre un acreedor y un deudor. No es un derecho personal, de índole creditoria. Es un derecho extrapatrimonial. No está, ni puede estarlo, en el comercio de los hombres. De aquí que los particulares no pueden disponer de la acción de filiación, ya trasmitiéndola, ya ratificándola, ya transigiéndola. G. Velázquez, *La extinción de la acción de filiación en el derecho puertorriqueño*, 17 (Núm. 4) Rev. C. Abo. P.R. 237, 241–242 (1957).

■ Por ello, la prescripción no tiene cabida en la acción de filiación. W. Cortés Burgos, *El problema de la caducidad en la filiación*, XXII (Núm. 86) Rev. Der. Pur. 185 (1982-1983). Aquí también los términos son de caducidad. Pero, además, los términos de caducidad de la acción del hijo para establecer su verdadera filiación son mucho más amplios que los del marido para impugnar la paternidad legítima. *Cf.* Art. 126 del Código Civil, 31 L.P.R.A. sec. 505; Rivero Hernández, *op. cit.*, pág. 485.

■ Así, el Art. 126 del Código Civil, *supra*, establece que el hijo natural puede establecer la acción de reconocimiento contra sus padres en vida de éstos y la acción de filiación *dentro del año siguiente a la muerte de éstos, Ortiz Rivera v. Sucn. González Martínez*, 93 D.P.R. 562 (1966), excepto cuando el padre o la madre haya muerto durante la menor edad del hijo, en cuyo caso éste podrá ejercitar la acción *dentro de los cuatro (4) años siguientes de haber cumplido la mayor edad, Texidor Díaz v. Tribunal Superior*, 94 D.P.R. 666 (1967); o si después de la muerte del padre o de la madre, apareciere algún documento del que antes no se hubiese tenido noticia y en el cual reconozcan

al hijo, en cuyo caso la acción deberá ejercitarse dentro de los *seis (6) meses siguientes al hallazgo del documento.*

De lo expuesto anteriormente se desprende que, aunque más amplios que los términos establecidos en el Art. 117 del Código Civil, *supra* (para el marido impugnar su paternidad legítima) los establecidos en el Art. 126 del Código Civil, *supra* (para que los hijos logren su reconocimiento o filiación) también son de caducidad; de ahí que se puede afirmar que en Puerto Rico pueden existir hijos sin padres, puesto que si dejasen transcurrir esos términos de caducidad perderían su derecho de filiación.[9] La premisa inarticulada subyacente en el Art. 126, *supra,* es que los hijos tienen la obligación de tramitar diligentemente sus acciones de reconocimiento o de filiación para dar seguridad y estabilidad a su *status* filiatorio.

Nuestra jurisprudencia ha expeditado el camino en esa dirección, derrumbando barreras sociales levantadas contra los inocentes que le impedían alcanzar su *status* de hijo con todos los derechos y obligaciones que ello conlleva. Desde *Figueroa v. Díaz,* 75 D.P.R. 163 (1953) (interpretando la Ley Núm. 229, *supra*) pasando por *Ocasio v. Díaz,* 88 D.P.R. 676 (1963), y *Agosto v. Javierre,* supra, hasta llegar a *Ramos v. Marrero,* supra, hemos reconocido, como un valor social sumamente importante, la seguridad jurídica que brinda la estabilidad del estado civil de los hijos. Ello, en unión a los principios constitucionales de igualdad y de dignidad del ser humano —Const. E.L.A., *supra,* Sec. 1— permite un trato diferencial en los términos que se le concede a los hijos para buscar su filiación y los que se le concede al marido para impugnar su paternidad

---

[9] Ese efecto, a veces demasiado duro, encuentra su justificación en el principio de que los pleitos no pueden prolongarse indefinidamente.

Debe recordarse, además, que nuestro ordenamiento le reconoce una causa de acción bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, a aquel hijo a quien los herederos del padre le induzcan a perder su causa de filiación mediante actos engañosos, dolosos y culposos. *Reyes v. Sucn. Sánchez Soto,* 98 D.P.R. 305 (1970).

legítima.([10]) Tal justificación objetiva permite la diferencia-ción en el trato jurídico de padres e hijos. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975).

 Ahora bien, los términos de caducidad dispuestos en el Art. 117 del Código Civil, *supra*, son para que el marido impugne la filiación legítima, esto es, la procedente del matrimonio. Esa legitimidad se fundamenta en las siguientes circunstancias:

> (1) Matrimonio de los padres.
> (2) Concepción durante el matrimonio.
> (3) Maternidad o filiación del hijo respecto de la esposa.
> (4) Identidad del hijo con el nacido de la esposa.
> (5) Paternidad o filiación del hijo respecto del marido. D. Espín, *Manual de Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, 1956, Vol. IV, pág. 212.

Por ello, señala Clemente de Diego: "Toda acción de impugnación de legitimidad puede fundarse o en negar el matrimonio, o en negar que la concepción fue durante el matrimonio, o en negar que el marido de la madre es el padre, o en negar que la mujer es la madre, o en negar la identidad del hijo, o en negar, en suma, cualquiera de las circunstancias cuya reunión forma la base de la legitimidad." F. Clemente de Diego y Gutiérrez, *Instituciones de Derecho Civil Español*, Madrid, Ed. Pueyo, 1930, T. II, pág. 510.

 Los términos dispuestos en el Árt. 117 del Código Civil, *supra*, son claros. *El marido debe ejercitar la acción dentro de los tres (3) meses siguientes a la inscripción cuando se halla en Puerto Rico y de seis (6) meses, a partir desde que tuvo conocimiento del nacimiento, si está fuera de Puerto Rico.* El efecto de no ejercitar la acción dentro de ese término será que el hijo, aunque biológica-

---

([10]) Recuérdese, además, que los términos de las acciones de los menores se suspenden durante su minoridad. *De Jesús v. Chardón*, 116 D.P.R. 238, 254 (1985). De ahí, también, las diferencias de términos de caducidad para instar unas y otras acciones.

mente no lo sea, jurídicamente se reputará suyo, con todos los efectos que conlleva tal estado civil. Tal resultado es el efecto del carácter de caducidad del término.

██ Sabido es que la caducidad se define como "la decadencia de un derecho o la pérdida del mismo por no haber cumplido, en el plazo determinado, la formalidad o condición exigida". A. García Valdecasas, *Diccionario de Derecho Privado–Apéndice*, Barcelona, Ed. Labor, 1963, pág. 178; Cortés Burgos, *supra*, pág. 186; G. Velázquez, *La extinción de la acción de filiación en el derecho puertorriqueño*, 17 (Núm. 4) Rev. C. Abo. P.R. 237, 246–251 (1957).

██ Esta decadencia o pérdida de la acción para hacer valer ese derecho se produce automáticamente por no ejercitarse en el transcurso del plazo. El sujeto no adquiere el derecho existente por incumplir con la formalidad o condición exigida dentro del plazo. Por su naturaleza, no admite interrupción. *Santiago Ojeda v. Cruz Maldonado*, supra. De ahí que el juzgador la pueda hacer valer *sua sponte*.

██ Los términos de caducidad del Art. 117 del Código Civil, *supra*, corren a partir de: (1) la inscripción de la filiación en el registro civil, en el caso en que el marido se halle en Puerto Rico, y (2) el momento en que el marido que no está en Puerto Rico conoce el nacimiento. Esta diferencia en el punto de partida del término de caducidad, antes como ahora, se refiere y prevalece mientras subsiste el desconocimiento del hecho del nacimiento en el segundo caso. Nunca ha sido interpretado como que se refiere a la ignorancia o desconocimiento por el padre legal de la realidad de su paternidad en cuanto al hijo. J.L. Lacruz Berdejo y F.A. Sancho Rebullida, *Elementos de derecho civil: derecho de familia*, Barcelona, Librería Bosch, 1982, T. IV, pág. 640; J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, 7ma ed. rev., Madrid, Ed. Reus, 1956, T. I, págs. 676–680.

■ El legislador tomó como punto de partida para el cómputo de estos términos el hecho objetivo de la inscripción del nacimiento en el Registro Demográfico, en el primer caso, y el hecho subjetivo del conocimiento del nacimiento, en el segundo caso, para dar la mayor certeza posible al plazo.[11]

## VII

El Art. 117 del Código Civil, *supra*, proviene del Art. 113 del Código Civil español. El Art. 113 del Código español no tenía equivalente en la Ley de Matrimonio civil española, pero sí en el proyecto de 1851 y es igual al Art. 92 del proyecto de 1882. J.M. Manresa y Navarro, *Comentarios al Código Civil español*, 3ra ed., Madrid, Imprenta de Revista de Legislación, 1907, T. I, págs. 505–506. Disponía el Art. 113 del Código Civil español lo siguiente:

> La acción para impugnar la legitimidad del hijo deberá ejercitarse *dentro de los dos meses siguientes a la inscripción del nacimiento en el Registro, si se hallare en el lugar el marido*, o, en su caso, cualquiera de sus herederos.
> Estando *ausentes*, el plazo será de *tres meses si residieren en España, y de seis [meses] si fuera de ella.* Cuando se hubiere ocultado el nacimiento del hijo, el término empezará a contarse desde que se descubriere el fraude. (Énfasis suplido.)

Comentando ese artículo nos decía Manresa:

> El Código actual ... cuenta los días desde la inscripción en el Registro y no desde la noticia del nacimiento, a no ser en caso de ocultación.
> ... lo indudable es que el Código supone, en el caso del párrafo primero de este artículo, que el marido o los herederos *conocen* el hecho de la inscripción; porque si no les es conocida por cualquier causa, ¿qué base tiene la presunción de la ley en

---

[11] Confróntese con el Art. 1.594 del Código Civil alemán de 1961, que deja al arbitrio del conocimiento subjetivo del marido —*de las circunstancias que le hacen presumir la ilegitimidad del hijo*— el inicio del cómputo del plazo para impugnar.

favor del reconocimiento del nacido, ni la de la voluntad de los interesados en dejar transcurrir el plazo de impugnación? (Énfasis en el original.) L.M. Manresa y Navarro, *op. cit.*, pág. 506. Véanse, además: Q.M. Scaevola, *Código Civil*, 5ta ed. rev., Madrid, Ed. Reus, 1942, T. III, págs. 309–311; Espín, *op. cit.*, 1956, pág. 228.

Tan cerradísimo era el sistema de impugnación de la paternidad legítima en el Código Civil español de entonces, que Manresa vislumbraba que si el padre estaba presente, no protestaba y no realizaba junto a la madre la inscripción del nacimiento en el Registro Demográfico, renunciaba a la acción de impugnación aunque la instase dentro del plazo de dicho artículo. Manresa y Navarro, *op. cit.*, pág. 508.

Hoy día en España la situación ha variado. La Constitución Española de 1978 trajo consigo el reexamen de las normas del Código Civil. Ese documento consagra la igualdad de los españoles ante la ley y prohíbe el discrimen por razón de nacimiento. Art. 14, Constitución Española de 1978. Con respecto a los hijos dispone, específicamente, que:

> Los poderes públicos aseguran, asimismo, la protección integral de los hijos, iguales éstos ante la ley con independencia de su filiación .... *La ley posibilitará la investigación de la paternidad.* (Énfasis suplido.) Art. 39(2) de la Constitución Española de 1978, IV Constitución Española: Trabajos Parlamentarios, Sec. 22, pág. 5010 (1980).

La Ley Núm. 11 de 13 de mayo de 1981 introdujo una nueva redacción en los Arts. 108–141 del Código Civil español correspondiente al Título V del Libro I, "De la paternidad y filiación". Esa legislación se inspira en los tres (3) principios siguientes:

> 1. Ha desaparecido la anterior distinción entre hijos legítimos, legitimados, naturales e ilegítimos no naturales. También ha desaparecido la legitimación por concesión soberana.

2. Queda establecido el principio de igualdad de derechos entre todos los hijos.

3. Queda admitida la investigación de la paternidad y de la maternidad mediante toda clase de pruebas, incluso las biológicas. J. Puig Brutau, *op. cit.*, pág. 188.

A partir de esa reforma española al Código Civil, los Arts. 136–141 regulan las acciones de impugnación de filiación. El Art. 136 dispone el plazo para ejercitar la acción de impugnación de la paternidad legítima. Dispone dicho artículo:

El marido podrá ejercitar la acción de impugnación de la paternidad en el plazo de *un año contado desde la inscripción de la filiación en el Registro Civil*. Sin embargo, el plazo no correrá mientras el marido ignore el nacimiento.

Si el marido falleciere antes de transcurrir el plazo señalado en el párrafo anterior, la acción corresponde a cada heredero por el tiempo que faltare para completar dicho plazo.

Fallecido el marido sin conocer el nacimiento, el año se contará desde que lo conozca el heredero. (Énfasis suplido.) Puig Brutau, *op. cit.*, pág. 214.

Bajo tal esquema siempre es indispensable probar que la filiación impugnada no corresponde a la realidad.

La referida acción tiene como propósito "que se declare judicialmente que no es cierta la generación acreditada legalmente por el título o títulos de legitimación que se impugnan. El criterio seguido por el legislador español fue abrir, sin predeterminación de casos, la posibilidad de cuestionar judicialmente si en realidad el marido es el padre; la protección de la vida familiar, frente a pleitos abusivos, se deja a la discreción del Juez, en cuanto éste tiene la obligación de rechazar de plano la demanda si con ella no se presenta un principio de prueba de los hechos en que se funde (la propia impotencia, la ausencia, el adulterio de la mujer, la ocultación del hijo, etc.)". Guardiola, *Comentarios a las reformas del derecho de familia*, Madrid, Ed. Tecnos, 1984, pág. 994.

Como se desprende del Art. 136 del Código Civil español

antes citado, la acción de impugnación de la paternidad tiene un plazo de caducidad. La acción sólo puede ser ejercitada antes de que transcurra un año, una vez se cumpla un doble requisito: haberse practicado la inscripción y que el marido conozca el nacimiento. Los dos (2) requisitos son necesarios para que comience a correr el año. Véase Guardiola, *op. cit.*

"El plazo para ejercitar la acción [comenta Diego Espín] y los diversos supuestos para su cómputo están simplificados y mejor sistematizados en la nueva normativa." D. Espín Cánovas, *Manual de Derecho Civil Español*, 7ma ed., Madrid, Ed. Rev. Der. Privado, 1982, T. IV, pág. 389. J. Lacruz Berdejo y otros, en *El nuevo régimen de la familia*, 1ra ed., Madrid, Ed. Civitas, 1982, T. II, pág. 53, comentando el plazo para el ejercicio de la acción, señalan que frente a los plazos breves y distintos según los casos —dos (2), tres (3) o seis (6) meses— de la ley anterior, la nueva amplía y unifica el plazo para todos los casos y personas legitimadas: un año desde la inscripción de la filiación en el registro tanto para el padre como para el heredero. Este plazo no correrá para el primero si ignora el nacimiento. Véanse, además: E. Serna Moroño, *La Reforma de la Filiación*, Madrid, Ed. Montecorvo, 1985, pág. 321; L. Martínez-Calcerrada, *Impugnación Contradictoria de la paternidad*, La Ley, 1982–1983, pág. 781 y ss.; G. García Cantero, *La Reforma de la Filiación*, XXXVI (Núm. 1) Rev. Gen. Leg. y Jur. 133 (1983); A. Rodríguez Adrados, *La Filiación*, XXX (Núm. 120) Rev. Der. Not. 233 (1983); A. Pérez Fernández, *Ideas generales en torno al nuevo régimen de la filiación*, Anales de la Academia Matritense del Notariado, 1982, Vol. 25, págs. 421–483; M. Peña y B. Quirós, *De la Paternidad y Filiación*, en *Comentarios a las reformas del derecho de familia*, Madrid, Ed. Tecnos, 1984, pág. 775 y ss.

Aún después de la referida reforma al Código Civil español subsisten las interrogantes. Por ejemplo, Guardiola, *op. cit.*, pág. 997, se plantea:

c) El plazo fijado es de caducidad [cf. com. (Cap. II) II, B, 3.ª]. Transcurrido el plazo, ya no puede ejercitar la acción cualquiera que sea la causa por la que no fue ejercitada antes: porque no quiso un pleito escandaloso; porque, por las circunstancias subjetivas (por Ej., cautivo en país enemigo), no pudo ejercitarla antes; porque creyó equivocadamente (incluso con dolo de su mujer) que el hijo era suyo. *Ciertamente el carácter fatal de la caducidad está en armonía con el principio de seguridad jurídica que la misma Constitución garantiza* (cf. art. 9.º.3 Constitución). ¿Cabría en algún caso (imposibilidad subjetiva) abrir al marido, sin embargo, la posibilidad de impugnación? Pues según el Art. 24 de la Constitución todas las personas tienen derecho a obtener la tutela efectiva de sus derechos e intereses legítimos lo que, en ciertos casos, parecería negado —sobre todo, si no se admite el ejercicio de la acción por el representante legal—. *Podría invocarse, además, que está en juego un derecho defendido internacionalmente* (cf. art. 8.º del Convenio de Roma, para la protección de los derechos humanos), *el derecho del marido al respeto de su propia vida familiar, que —con deshonor* (cf. arts. 18 Constitución y L.O. 5 mayo 1982)— *aparece violado por la atribución de una falsa paternidad.* (Énfasis suplido.)

Otras legislaciones establecen términos más restrictivos que los de nuestro código. El código francés([12]) y el belga establecen un término de uno (1) y dos (2) meses para ejercer la acción; el italiano establece tres (3) meses en sus Arts. 244 y 246; en el holandés son dos (2) meses.

Las legislaciones recientes tienden a extender el plazo para el ejercicio de la acción de impugnación. Rivero Hernández, *op. cit.*, pág. 416. El Código Civil alemán (BWJB) establece un plazo de dos (2) años, contados "a partir del momento en que el marido tiene conocimiento de las circunstancias que hacen presumir la ilegitimidad del hijo", Art. 1.594. El Código Civil austriaco (Art. 156); el japonés (Art. 777); el griego (Art. 1.474), y la Ley de Matrimonio húngara establecen el plazo de un (1) año a partir de la

---

([12]) Gebler opina que el plazo legal debe extenderse en el código francés a cinco (5) años, plazo admitido por la Ley de 28 de julio de 1962 para impugnar los hijos legítimos en Polinesia. Rivero Hernández, *op. cit.*, pág. 416 esc. 61.

inscripción. El código etíope de 1960 (Art. 792); el Código de Familia polaco (Art. 48) y el Código Civil portugués de 1966 (Art. 1.818) establecen un término uniforme de seis (6) meses. El Código de Filipinas de 1953 (Art. 263) establece el término de un (1) año a partir de la inscripción si el marido está presente, y de año y medio (1½) o dos (2) años si el marido está ausente (Art. 263).

En el Código Civil argentino existe igualmente una acción de impugnación de la paternidad matrimonial (Art. 258). Dicha acción tiene el propósito de demostrar que el esposo no es el padre del hijo que dio a luz su esposa. La pretensión del accionante descansa en el Art. 243 de dicho Código Civil, el cual contiene una presunción de paternidad parecida a la del Art. 113 del Código Civil nuestro.

El Art. 259 del Código Civil argentino dispone:

Art. 259. La acción de impugnación de la paternidad del marido podrá ser ejercida por éste, y por el hijo. La acción del marido caduca si transcurre *un año desde la inscripción del nacimiento*, salvo que pruebe que no tuvo conocimiento del parto, en cuyo caso el término se computará desde el día en que lo supo. El hijo podrá iniciar la acción en cualquier tiempo.

En caso de fallecimiento del marido, sus herederos podrán impugnar la paternidad si el deceso se produjo antes de transcurrir el término de caducidad establecido en este artículo. En este caso, la acción caducará para ellos una vez cumplido el plazo que comenzó a correr en vida del marido. (Énfasis suplido.)

Como se desprende de lo anterior, la acción del padre caduca si transcurre un año desde la inscripción del nacimiento en el Registro del Estado Civil, salvo que acredite que no tuvo conocimiento del parto de la mujer, en cuyo caso el término de caducidad corre a partir de que toma conocimiento del alumbramiento. Véase N. Lloveras, *Patria Potestad y Filiación*, Buenos Aires, Ed. Depalmas, 1986, pág. 130.

Se ha dicho que si bien el plazo de caducidad supera el que regía en el sistema derogado, *es prudentemente breve*

*para salvaguardar la certeza del estado de familia, que exige que las relaciones jurídicas se definan en un tiempo razonable.* Lloveras, *op. cit.*

En Puerto Rico, el Comité del Consejo para la Reforma de la Justicia recomendó en 1974 la derogación de todas las disposiciones de nuestro Código Civil referentes a la filiación, incluso el Art. 117, *supra*, para dar paso a nuevos moldes jurídicos atemperados a los postulados constitucionales sobre la inviolabilidad de la dignidad del ser humano y de la igualdad de los individuos ante la ley. Véase Informe sobre el Libro Primero del Código Civil de Puerto Rico, sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico por el comité designado por dicho cuerpo para tal fin, San Juan, 1974, pág. 165 *et seq.* Dicho informe recomendó un mismo término de caducidad para la acción de filiación y para la de impugnación de reconocimiento, aunque con distinto punto de partida y dependiendo de si el impugnador se halla en Puerto Rico o en el exterior. En cuanto a la acción de impugnación de filiación o de paternidad legítima, *recomendó un término de seis (6) meses si el marido se halla en Puerto Rico y de un (1) año si está fuera, a partir, en ambos casos, desde que adviene en conocimiento del hecho objetivo del nacimiento.* Informe, *supra*, págs. 207 y 459–460. El hijo, o sus herederos a su muerte, tendría toda su vida para impugnar su filiación.

Entendió dicho Comité que "no obstante el hecho de que en la actualidad existen mejores y más amplios medios de transportación y comunicación, el plazo de tres a seis meses concedido en el Código vigente *es demasiado corto y se presta para consagrar como válidas y vinculantes ciertas relaciones paterno-filiales que no tiene apoyo en la realidad*". (Énfasis suplido.) Informe, *supra*, pág. 211.

Recientemente el Comité de Derecho de Familia de la Academia Puertorriqueña de Jurisprudencia y Legislación recomendó que se enmendara el Art. 117 del Código Civil, *supra*, para disponer que:

> El hijo, su presunto padre, su alegado padre biológico, madre o los herederos de estos podrán impugnar la filiación del hijo, disponiéndose que en lo referente al presunto padre o el padre biológico, la madre o los herederos de éstos, *la acción será una caducidad y deberá ejercitarse dentro del año a contar desde que se tuvo conocimiento del hecho del nacimiento.*
>
> Todo hijo podrá impugnar su estado filiatorio sujeto a los términos establecidos en este artículo. (Énfasis suplido.)

Según dicho comité, la enmienda propuesta "tiene como finalidad establecer un trato igual a las partes con interés", pues el Art. 117 vigente "solo reconoce la capacidad del presunto padre para impugnar respondiendo a un sistema de impugnación limitado que excluye a todo aquél con interés para llevar la acción de impugnación. Véase Art. 116 vigente.

De igual manera resulta ser muy restrictivo en cuanto el término que provee para iniciar la acción de impugnación para los interesados que estén en Puerto Rico, tres meses a partir de la fecha del registro del nacimiento; y por otro lado un término extremadamente amplio en el caso de que los posibles demandantes estuvieran fuera de Puerto Rico, seis meses a partir de que se tuvo el conocimiento del nacimiento". Véase Propuestas de Enmiendas al Código Civil de Puerto Rico, preparado por el Comité de Derecho de Familia de la Academia Puertorriqueña de Jurisprudencia y Legislación (mimeo), 11 de octubre de 1989, págs. 158–159.

*NUESTRA ASAMBLEA LEGISLATIVA NO HA ACTUADO SOBRE ESTAS RECOMENDACIONES.*

Este vía crucis por el análisis de la naturaleza del término para impugnar la paternidad legítima y las soluciones ofrecidas en otras jurisdicciones, al examinar el derecho comparado, nos permiten adentrarnos con amplitud de criterio al examen de la constitucionalidad del Art. 117 de nuestro Código Civil, *supra.*

## VIII

*Constitucionalidad del Art. 117 de Código Civil*

### A. *Igual protección de las leyes*

■ El Art. II, Sec. 7 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 275, prohíbe que se le niegue "a persona alguna en Puerto Rico la igual protección de las leyes". *Cf.* Emda. XIV, Sec. 1, Const. EE.UU., L.P.R.A., Tomo 1; Tussman y TenBrook, *The Equal Protection of the Laws*, 37 Calif. L. Rev. 341, 344–348 (1949). La prohibición de esta sección, hemos establecido, se da contra el trato desigual injustificado, *Zachry International v. Tribunal Superior*, supra, y no implica la exclusión de cualquier diferenciación entre las personas por su condición si tal diferenciación tiene una justificación objetiva. *Almodóvar v. Méndez Román*, supra; *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248 (1980); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984); *P.R.P. v. E.L.A.*, 115 D.P.R. 631 (1984); *Vda. de Miranda v. Srio. de Hacienda*, 114 D.P.R. 11 (1983). Como señala el profesor Serrano Geyls:

> La [C]onstitución debe reconocer derechos iguales a los ciudadanos cuando ellos son iguales y derechos desiguales cuando ellos son desiguales. (Énfasis suplido.) R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Ed. C. Abo. P.R., 1988, pág. 1078. Véanse, además: *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); *M.& B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987); *Salas v. Municipio de Moca*, 119 D.P.R. 625 (1987).

■ En *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972), expresamos que están sujetas a un minucioso examen judicial, por considerarse inherentemente sospechosas, todas las clasificaciones o discrímenes tangentes con la dignidad del ser humano y con el principio de igualdad ante la ley. En *León Rosario v. Torres*, 109 D.P.R. 804, 813–815 (1980), añadimos que en tales casos

debe aplicarse el escrutinio estricto para analizar la clasificación. Sobre ese análisis, la ley será válida si responde a un interés estatal apremiante y la clasificación es necesaria para promover ese interés, esto es, que no existe un medio menos oneroso para promoverlo. *Alicea v. Córdova*, 117 D.P.R. 676 (1986).

 Claro está, la aplicación de este análisis parte de la premisa de que la ley está brindando un trato desigual a personas similarmente situadas. Serrano Geyls, *op. cit.*, pág. 1086. Ese no es el caso de autos.

Las acciones de impugnación que la ley y la jurisprudencia le reconocen a los padres (incluyendo al marido) para impugnar la paternidad legítima o el reconocimiento, no pueden confrontarse con las acciones que se le reconoce al hijo para buscar su filiación, a los fines de hacer un análisis de igual protección de las leyes. La razón es sencilla. Los padres y los hijos no están similarmente situados en nuestro ordenamiento jurídico. Los padres tienen, con respecto de sus hijos menores no emancipados, el deber de educarlos —Const. E.L.A., *supra*, Sec. 5; 18 L.P.R.A. sec. 80(g); Art. 153 del Código Civil, 31 L.P.R.A. sec. 601; *Guadalupe Viera v. Morell*, 115 D.P.R. 4, 11 (1983); *Key Nieves v. Oyola Nieves*, 116 D.P.R. 261 (1985)— alimentarlos —Art. 153 del Código Civil, *supra;* Art. 143 del Código Civil, 31 L.P.R.A. sec. 562; *Guadalupe Viera v. Morell*, supra, pág. 12— cuidar su salud física y mental —Art. 153 del Código Civil, *supra*— consentir a su matrimonio —Art. 70(4) y 74 del Código Civil, 31 L.P.R.A. secs. 232(4) y 242— corregirlos moderadamente —Art. 153 del Código Civil, *supra;* 8 L.P.R.A. sec. 402; *Pueblo v. Ponce Ávila*, 105 D.P.R. 213 (1976)— vigilarlos —Art. 1803 del Código Civil, 31 L.P.R.A. sec. 5142— protegerlos de peligros físicos y morales —*Álvarez v. Irizarry*, 80 D.P.R. 63 (1957)— así como consentir a su adopción —Art. 135 del Código Civil, 31 L.P.R.A. sec. 536; *M.J.C.A., menor v. J.L.E.M., menor*, 124 D.P.R. 910 (1989)— entre otros.

Sin embargo, en esta etapa de la vida de un hijo, éste no tiene obligaciones sino derechos frente a sus padres. Se ha dicho que frente a los padres los menores tienen derechos legales y morales. Entre los primeros se incluye el derecho a alimentos, a herencia y al apellido de los padres. Entre los últimos pueden incluirse el derecho a que sus padres le dispensen amor y afecto, que le impongan disciplina, orientación, buenos hábitos de convivencia y de aseo personal, a crecer en un ambiente hogareño propicio a su desarrollo, a que se le trate con equidad, a que se emancipe cuando ello sea factible y propenda a su bienestar, a que se le trate en forma especial frente a la autoridad pública, y a que se le oiga y preste atención. Foster y Freed, *A Bill of Rights for Children*, 6 Fam. L.Q. 343, 347 (1972), según citado en E. González Tejera, *Bienestar del menor: señalamiento en torno a la patria potestad, custodia y adopción,* 54 Rev. Jur. U.P.R. 409, 412 esc. 11 (1985).

Esas diferencias en la situación jurídica de padres e hijos subsiste cuando el menor adviene a la mayoridad. Hemos reconocido que el deber de los padres de educar a los hijos subsiste, bajo ciertas circunstancias, durante la mayoridad del hijo. *Key Nieves v. Oyola Nieves*, supra. De igual manera, subsiste el derecho de los hijos a llevar el apellido del padre y a heredarlo; mientras que el hijo mayor de edad sólo tiene, respecto al padre, el deber legal de alimentarlo en algunas circunstancias —Art. 143 del Código Civil, *supra*— y el padre tiene derecho a heredarlo en ciertas circunstancias.

■■■ *Estas diferencias entre padres e hijos permiten que exista un trato diferencial en los plazos para instar las acciones de filiación de los hijos y las de impugnación de los padres. Tradicionalmente, se ha reconocido que esas dife-*

*rencias sirven de justificación objetiva para darle a ambos grupos un trato jurídico diferente.*([13])

 Aun cuando en *Agosto v. Javierre*, supra, reconocimos que el hijo podía impugnar, implícitamente, la presunción de paternidad del marido, catalogamos la acción del hijo como una *primordialmente* de filiación. Por ello se justificaba la aplicación del término para la acción dispuesto en el Art. 126 del Código Civil, *supra*. Véanse: Ley Núm. 229, *supra*; *Ocasio v. Díaz*, supra; *Ortiz Rivera v. Sucn. González Martínez*, supra; *Ortiz v. Cruz Pabón*, 99 D.P.R. 237 (1970).

 Ahora bien, el padre biológico que impugna la paternidad del marido([14]) y el que impugna el reconoci-

---

([13]) Nuestra jurisprudencia se ha esforzado al máximo para uniformar los términos para instar la acción de filiación de los distintos hijos. *Ocasio v. Díaz*, 88 D.P.R. 676 (1963). Ello, como postulado de la equiparación total entre los hijos.

En la jurisdicción federal véanse: *Mills v. Habluetzel*, 456 U.S. 91 (1982); *Pickett v. Brown*, 462 U.S. 1 (1983).

([14]) El padre biológico o progenitor que impugna la presunción de paternidad del marido tiene igual término que éste para ejercitar la acción. En *Ramos v. Marrero*, 116 D.P.R. 357 (1985), le reconocimos la capacidad al padre biológico para impugnar la presunción de paternidad del marido. Nada dispusimos en cuanto al término para instar dicha acción. Consideramos que, para uniformar los remedios, las impugnaciones y la caducidad de las acciones como una cuestión de conveniencia en el curso ordenado de la justicia y en respuesta a la equiparación de los derechos derivados de la filiación, Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1; Const. E.L.A., *supra*, Sec. 7; Ley Núm. 17 de 20 de agosto de 1952 (31 L.P.R.A. sec. 441); *Ocasio v. Díaz*, supra; *Ortiz Rivero v. Sucn. González*, 93 D.P.R. 562, 597 (1963); el padre biológico también tiene que impugnar la presunción de paternidad del marido dentro de los tres (3) meses posteriores a la inscripción en el Registro Demográfico o los seis (6) meses luego de conocer el nacimiento si se halla fuera de Puerto Rico. Véanse: A. Calderón, *La filiación en Puerto Rico*, 2da ed., Ed. Rev. C. Abo. P.R., 1978, pág. 152 *et seq.;* A. Blanco, *Sobre la reforma del Código Civil*, 43 (Núm. 1) Rev. Jur. U.P.R. 103, 127–132 (1974). Si el padre biológico quiere impugnar la presunción de paternidad del marido no puede esperar a que dicha presunción se consolide por el transcurso del plazo. Sería un contrasentido sostener que al mismo tiempo que el marido no puede impugnar la presunción de ley —por haberse consolidado una vez transcurrido el plazo— se le permita, a quien alega ser padre biológico, hacerlo. Permitirlo sería dejar a la deriva el *status* civil del hijo al arbitrio del presunto padre.

En *Ramos v. Marrero*, supra, pág. 369, aunque el *issue* principal era la capacidad del padre biológico para instar la acción de impugnación de paternidad, Art. 116 del Código Civil, *supra*, ya habíamos adelantado nuestra posición en cuanto al término de éste para instar la acción. A la luz de la posición de Calderón, *op. cit.*, y de Blanco, *supra*, señalamos:

miento voluntario([15]) están en similar situación jurídica que el marido que impugna su paternidad legítima. *A éstos la ley les brinda igual trato.*([16])

### B. *Debido proceso de ley*

El Art. II, Sec. 7 de la Constitución del Estado Libre Asociado, *supra*, también reconoce que:

Ninguna persona será privada de su libertad o propiedad sin [el] debido proceso de ley ....

Sabido es que "[l]a filiación, bien sea natural o por adopción, origina una serie de derechos y obligaciones entre los miembros de la familia", *Almodóvar v. Méndez Román*, *supra*. Como exponen Díez-Picazo y Gullón, "[e]sa inicial realidad biológica es recogida y regulada *a posteriori* por el ordenamiento jurídico,([17]) que distribuye derechos y obliga-

---

"No obstante, ambos autores coinciden en que el procedimiento a seguir debe ser que el padre biológico *impugne primero* la presunción de paternidad ...." (Énfasis suplido.)

Para que el padre biológico pueda impugnar primero la presunción de paternidad no puede esperar a que dicha presunción se consolide por el transcurso del plazo dispuesto en el Art. 117 del Código Civil, 31 L.P.R.A. sec. 465.

([15]) Recientemente tuvimos oportunidad de expresarnos sobre el término que tiene un padre que reconoce voluntariamente a un hijo para impugnar dicho reconocimiento. En *Almodóvar v. Méndez Román*, 125 D.P.R. 218, 260 (1990), resolvimos "que la acción del impugnación del reconocimiento deberá ser radicada dentro del plazo de caducidad de tres meses, contado el mismo a partir de la fecha en que se inscribe dicho reconocimiento en el Registro Demográfico o desde la fecha del documento público correspondiente en que se lleva a cabo el mismo". (Énfasis suprimido.)

Aclaramos que en aquellos casos en que el reconocimiento es producto de la *violencia o intimidación*, el término de tres (3) meses empieza a correr desde la fecha en que cesa la intimidación o la violencia. En aquellos casos *donde se alegue error* por parte del reconocedor, el término debe contarse desde la fecha en que se llevó a cabo el reconocimiento.

De suerte que con esta decisión se uniforma el trato jurídico entre el padre reconocedor, que luego impugna su paternidad, y el padre-marido, en relación al plazo de uno y otro para instar la acción impugnatoria.

([16]) En vista de ello debemos concluir que el Art. 117 del Código Civil, *supra*, no viola la igual protección de las leyes a aquellos que instan una acción de impugnación de paternidad y que ante la ley están similarmente situados: el marido, el progenitor y el padre reconocedor. *Cf. Pueblo v. Vélez Vélez*, 97 D.P.R. 123, 128 (1969). No se activa la protección constitucional, pues no se establece clasificación alguna entre los impugnadores igualmente situados ante la ley.

([17]) En *Ocasio v. Díaz*, supra, pág. 733 esc. 10, señalamos que:

ciones entre los progenitores y los seres procreados por ellos o, dicho de modo más sencillo, entre padres e hijos". (Énfasis en el original.) Díez-Picazo y Gullón, *op. cit.*, pág. 311.

Sin duda que la filiación impone derechos y obligaciones en los padres a favor de los hijos. Los deberes de los padres de educar, alimentar y cuidar la salud física, mental, etc., de los hijos imponen una carga económica significativa sobre aquéllos. El incumplimiento con esos deberes sujeta a los padres a acciones criminales, Arts. 158, 160 y 164 del Código Penal, 33 L.P.R.A. secs. 4241, 4242 y 4247, respectivamente, y a acciones civiles, Arts. 118, 119 y 125 del Código Civil, 31 L.P.R.A. secs. 466, 481 y 504, respectivamente.

 Por ello, la garantía constitucional del debido proceso de ley cobija al marido que impugna la presunción de paternidad de los hijos de su esposa nacidos vigente el matrimonio o antes de los trescientos (300) días siguientes a

---

"También, como secuela de la Ley Núm. 229, se creó una peculiar situación respecto a las declaraciones categóricas de los Arts. 112 y 113 de nuestro Código Civil al efecto de que son hijos legítimos los nacidos después de la celebración del matrimonio y los nacidos antes de los trescientos días siguientes a su disolución. Hasta el 10 de agosto de 1952, cuando nacía un hijo de mujer casada y hombre soltero, la barrera del adulterio le impedía al padre natural reconocerlo ante el derecho. Claro que nada impedía, que el padre, como cuestión de hecho, aceptara que procreó un hijo adulterino. El esposo, por obra y gracia de los Arts. 112 y 113 —para proteger al hijo y la fidelidad marital— sin que las células sexuales de su mujer se hubieran unido con sus gametos masculinos, se convertía en padre legítimo del hijo de otro. Se producía una especie de partenogénesis jurídica masculina.

"Después de entrar en vigor la Ley Núm. 229 esa presunción de legitimidad quedó, sino debilitada, por lo menos pareada con el derecho que esa ley concede al padre natural para que reconozca como hijo suyo al fruto de su unión adulterina, no obstante los preceptos terminantes de los Arts. 112 y 113. La situación que a juicio nuestro se crea es la de dos personas, una considerada el padre jurídico, y la otra, el padre natural, biológico, real y verdadero, a quienes, simultáneamente, la ley concede el derecho de inscribirlo como hijo.

"Como padre de ese hijo debería prevalecer el que de ellos primeramente lo inscribió como hijo suyo en el Registro Demográfico y asumió el cumplimiento de las serias y graves responsabilidades paternofiliales, con mejor razón en una época como la presente en que para el padre jurídico es simplemente un hijo y para el natural, también simplemente, es un hijo. Le tocaría al que no lo inscribió como hijo suyo, impugnar ante los tribunales la validez de la inscripción registral."

su disolución. Esta garantía, en su aspecto sustantivo, le reconoce al marido el derecho a tener su día en corte para presentar su causa de acción para que sea justamente adjudicada en sus méritos. En su aspecto procesal le garantiza una notificación y una audiencia adecuadas con la asistencia de todas las partes en competencia y con el derecho a presentar toda la evidencia pertinente a la controversia. Véanse: *Alicea v. Córdova*, 117 D.P.R. 676, 701 (1986); *Ortiz v. Peña*, supra.

En el caso de autos el recurrente sostiene que el término para instar la acción de impugnación dispuesto en el Art. 117 del Código Civil, *supra*, es irrazonablemente corto y tiene el efecto de no permitirle presentar prueba científica para impugnar su paternidad legítima, aun cuando es luego de transcurrido dicho término que "toma conocimiento" de las causas que le hacen presumir que el hijo no es suyo y acude a los tribunales para buscar una solución a su "problema".

 Hemos sostenido que viola el debido proceso de ley un estatuto que, en su aplicación, convierte en irrisorio el remedio solicitado al operar en un período de tiempo tan corto que no le brinda a la parte perjudicada una oportunidad razonable para ejercitar la acción. *Alicea v. Córdova*, supra, pág. 696. Ello es así, ya que se reconoce que el derecho de ejercitar la acción civil es un derecho fundamental cuya restricción, por parte del Estado, debe estar fundamentada en un interés apremiante promovido por el medio menos oneroso. *Alicea v. Córdova*, supra; *Torres v. Castillo Alicea*, 111 D.P.R. 792 (1981).

 Apliquemos ese análisis al Art. 117 del Código Civil, *supra*, considerando que el problema constitucional de si un término legal es irrazonablemente corto para ejercitar la acción depende, en gran medida, del punto de partida que fije la ley para comenzar el cómputo del plazo más bien que de su extensión.

Los términos dispuestos en el Art. 117 del Código Civil, *supra*, han sido sostenidos a base de diversos intereses del Estado. Al respecto nos señala Rivero Hernández:

> Suele invocarse en su justificación la necesidad de cierta estabilidad del estado civil de las personas, la seguridad jurídica en las relaciones de estado, y el evitar que el hijo sea víctima de las querellas conyugales: si el marido tiene alguna duda acerca de su propia paternidad —se dice—, podrá darse cuenta en cuanto nazca el hijo, y podrá y deberá impugnarlo enseguida; hacerlo mucho después haría un tanto sospechosa su actitud.
>
> Sin embargo, piensan otros que las razones de seguridad jurídica y estabilidad del estado son igualmente válidas para las demás acciones sobre paternidad y filiación, y ello no obstante, son imprescriptibles (tal, la de reclamación: art. 118 C.c. español). Puede ocurrir también que el marido se entere después de unos meses del nacimiento del hijo de hechos o circunstancias que le induzcan a impugnar su paternidad, y si los plazos son breves, la acción habrá caducado; a veces, el plazo es tan breve (en algunas legislaciones, de sólo un mes) que apenas le dará tiempo para pensar sobre la impugnación, reunir datos, confiar el asunto a un abogado ..., y ello, suponiendo que otras razones personales o familiares (enfermedades, dificultades económicas ...) no absorban con más razón su atención y su tiempo. Por todos estos motivos, no extrañará que por algún sector doctrinal se reclame la ampliación de aquellos plazos, y aun que la acción sea imprescriptible. (Escolios omitidos.) F. Rivero Hernández, *La Presunción de Paternidad Legítima*, Madrid, Ed. Tecnos, 1971, págs. 415-416.

Para otros, la protección de la "paz familiar" es fundamento suficiente para sostener la brevedad de esos términos y su carácter de caducidad. Así, Díez-Picazo y Gullón sostienen:

> Por otra parte, se protege el ámbito de la paz familiar y sólo se rompe en la medida necesaria para preservar muy concretos valores e intereses que son prioritarios. Se desprende ello de las limitaciones que se establecen a la legitimación para el ejercicio de las acciones de filiación. La rápida caducidad de las acciones es medida que también trata de conseguir la misma finalidad. L. Díez-Picazo y A. Gullón Ponce de León, *Sistema de Derecho Civil*, 3ra ed. rev., Madrid, Ed. Tecnos, 1983, T. IV, pág. 314.

Recientemente reconocimos este fundamento como suficiente para establecer que el padre reconocedor de un hijo sólo tiene disponible el término de tres (3) meses dispuesto en el Art. 117 del Código Civil, *supra*, para impugnar su acción de reconocimiento voluntario. *Almodóvar v. Méndez Román*, supra. Allí señalamos:

> La doctrina española ha reiterado que la presunción *pater is est quem iustae nuptiae demonstrant "representa la primacía de lo social sobre lo biológico en Derecho, primacía justificada hoy por la constelación de fines que la familia legítima satisface: la idea patrimonial, la idea del respeto a las decisiones privadas, aspectos económicos y de higiene social, efecto estabilizador de reservas íntimas de responsabilidad; todo esto basta para fundamentar semejante principio de un modo independiente."* J. Puig Brutau, *Fundamentos de derecho civil*, Barcelona, Ed. Bosch, T. IV, Vol. II, págs. 10–11; D. Espín Cánovas, *Manual de derecho civil español*, 3ra ed., T. IV, pág. 264; J. Lacruz Berdejo y S. Rebullida, *Derecho de familia*, Barcelona, Ed. Bosch, 1978, pág. 367; R. Bonet, *Compendio de derecho civil*, Madrid, Ed. Rev. Der. Privado, 1960, T. IV, pág. 518; C. Grossman, *Acción de impugnación de paternidad del marido*, Buenos Aires, Ed. Abaco, 1982.
>
> Es indudable que se sigue valorando la familia matrimonial como régimen socialmente más deseable. Peña y Quirós, *op. cit.*, pág. 786. En este sentido, la presunción *pater is est...* tiene razón de ser solamente dentro de un marco que propulsa el concepto de "legitimidad" como una protección a la institución del matrimonio. A. Calderón, *La filiación en Puerto Rico*, 2da ed., San Juan, Ed. C. Abo. P.R., 1978, pág. 174. A estos efectos Serna Moroño señala que "el matrimonio tiene 'significado de fundamento de la familia, institución ésta a la que los poderes públicos deben protección jurídica', y no puede ignorarse que, en principio, el matrimonio confiere certeza en la paternidad, lo cual va a incidir de manera directa sobre el régimen de las acciones, 'haciendo más fácil la reclamación de una filiación, matrimonial y más difícil su impugnación' ". *Op. cit.*, pág. 184. (Énfasis suplido.)

Más adelante añadimos:

> Al establecer los plazos de caducidad del Art. 117 del Código Civil, ante, el legislador hizo un balance entre el derecho de un individuo a deshacer una realidad jurídica inexacta y el dere-

cho de una persona a la seguridad de su estado civil, así como el interés del Estado en la estabilidad de las relaciones filiatorias.

Citando a Manuel Peña y Bernardo Quirós, expusimos los estados civiles de la persona que depende de la estabilidad del *status* filiatorio de dicha persona:

> ... de ser hijo de tal o cual persona deriva que se tenga una u otra nacionalidad, o una u otra vecindad ... cualidades éstas que deciden el régimen de los demás estados de la persona ya que la capacidad y las relaciones familiares se rigen por la ley personal ... aparte de la transcendencia que la determinación de la ley personal tiene en el régimen de otras materias (sucesiones, donaciones, obligaciones) ... De la filiación depende directamente además la determinación de las personas que están legitimadas para provocar un cambio de estado civil (emancipación, adopción), o para promover judicialmente el cambio (por incapacitación). La filiación determina, también, las personas de quienes se está sujeto durante la minoría de edad (o en situación de patria potestad prorrogada). Influye la filiación en el poder de la persona: por la filiación se conoce si una persona tiene herederos forzosos, con la consiguiente trascendencia en relación con la potestad de donar ... o de disponer 'mortis causa' ... o, en general, con la potestad de gestión del propio patrimonio (por la posible, declaración de prodigalidad) .... (Citas y artículos omitidos.)
>
> [l]a filiación es un estado civil familiar, un "status familiae": la filiación, sea matrimonial o no matrimonial, concreta la situación de cada persona dentro de la organización de la respectiva familia, con los consiguientes poderes y deberes (apellidos, alimentos, derechos sucesorios, funciones tuitivas, derechos y deberes de los herederos forzosos), incompatibles (para actuar como juez, árbitro, perito, testigo, "intervivos" o es testamentos, notario, registrador), prohibiciones (impedimento de parentesco para el matrimonio) y trascendencia penal en la tipificación de los delitos o en la medida de las penas. Como estado familiar tiene efectos correlativos —no siempre del mismo alcance— con los demás miembros de la familia y, en primer lugar, con los padres: la condición de hijo se corresponde con la de padre o madre que también son estados civiles. (Citas y artículos omitidos.) M. Peña y B. de Quirós, *De la Paternidad y la Filiación*, en *Comentario a las reformas del derecho de familia*, Madrid, Ed. Tecnos, 1984, Vol. I, págs. 795–796.

En el caso de autos, el legítimo interés del Estado en la

protección de la paz y la integridad familiar no puede ser el fundamento para la aplicación del término de tres meses luego de la inscripción en el Registro Demográfico, estando el marido en Puerto Rico. Aquí el marido instó una demanda de divorcio, predicada en el alegado adulterio de su esposa, sosteniendo que ésta vive en público concubinato con otro hombre. Aduce, además, que su esposa le admitió a varias personas que el hijo impugnado lo es del concubino y no del recurrente.

⬛ En estas circunstancias la justificación del Estado no puede ser la protección de la paz familiar ni la integridad del matrimonio. Sería insostenible que en pro de mantener una paz y una integridad familiar, artificialmente se mantuviera una paternidad falsa. *Agosto v. Javierre*, supra, pág. 491. El hecho mismo de la acción de divorcio refleja que aquí no existe paz e integridad familiar que proteger. De suerte que, si esa fuera la única justificación para sostener los términos de tres (3) y seis (6) meses del Art. 117 del Código Civil, *supra*, no tendríamos reparo en decretar su inconstitucionalidad.

*Sin embargo, el Estado tiene un interés apremiante en preservar la estabilidad y la seguridad en el "status" de los miembros de la familia.* Ese interés sobrepasa el del esposo en impugnar la legitimidad de los hijos nacidos vigente el matrimonio o dentro de los trescientos (300) días siguientes a su disolución. El legislador estableció que en el balance de intereses entre el derecho de una persona a la seguridad de su estado civil (y de los demás estados que dependen del estado filiatorio así establecido) y el del marido a deshacer una realidad jurídica inexacta, debía prevalecer el primero. Para ello estableció un plazo breve y de caducidad para ejercitar la acción.

Esa determinación del legislador tiene justificación en Puerto Rico, aun luego de la aprobación de nuestra Constitución. *Todavía hoy sigue siendo un interés apre-*

*miante del Estado el establecer con certeza y prontitud el estado filiatorio de sus ciudadanos.* Ni la Ley Núm. 229, *supra,* ni la Constitución del E.L.A. ni lo resuelto por este Tribunal en *Ocasio v. Díaz,* supra, alteraron, derogaron o modificaron lo dispuesto en el Art. 117 del Código Civil, *supra*, respecto a los términos del marido para impugnar la presunción de paternidad. Por el contrario, las disposiciones constitucionales y legales, así como nuestras interpretaciones judiciales, *lo que han hecho es fortalecer el derecho de los hijos, matrimoniales o extramatrimoniales, a tener un estado filiatorio rápido, cierto, seguro y estable. Así, el poder judicial nuevamente ha intervenido para proteger a los hijos del fenómeno histórico de su rechazo y abandono absoluto y arbitrario por parte del padre.*

▮ Sin duda, el medio utilizado por la Asamblea Legislativa para promover la estabilidad del *status* de los hijos matrimoniales es el menos oneroso. El marido tiene, si vive en Puerto Rico, los nueve (9) meses de gestación y los tres (3) meses posteriores a la inscripción en el Registro Demográfico para impugnar la presunción de paternidad que le impone el Art. 113 del Código Civil, *supra.*

En caso del marido se halle presente en Puerto Rico, el legislador dispuso que la deseada estabilidad en el *status* de los individuos se lograría estableciendo un término breve de caducidad que comenzaría a contarse desde la ocurrencia de un suceso cierto y objetivo: la inscripción del nacimiento en el Registro Demográfico. Disponer que el término comenzará a contarse desde que subjetivamente el impugnador conociera las causas que dan base para presumir que el hijo nacido vigente el matrimonio no es suyo, sería dejar a su arbitrio el momento en que desee destruir el *status* del hijo, trayendo incertidumbre e inestabilidad en el *status* de los hijos nacidos en el matrimonio. Tal alternativa traería serias consecuencias sociales y económicas para los hijos, la madre y el Estado. ¿A quién el hijo le

reclamará alimentos, educación y apellidos? ¿Cómo el Estado repartiría derechos y exigiría las obligaciones en las relaciones paternofiliales? ¿Cómo se transmitiría la propiedad *mortis causa* en una situación de derecho tan incierta?

La ley no puede asegurar la fidelidad de los cónyuges, pero sí asegurar el remedio al marido con respecto a la paternidad del hijo producto de una relación ilícita. La seguridad, certeza y estabilidad del *status* del hijo exigen, sin embargo, que el marido sea diligente en disipar sus dudas.

*SIEMPRE QUEDA RESERVADO A LA ASAMBLEA LEGISLATIVA LA FACULTAD DE AMPLIAR EL TÉRMINO PARA EJERCITAR LA ACCIÓN DE IMPUGNACIÓN DE PATERNIDAD LEGÍTIMA. Mientras, nuestro deber es interpretar la ley a la luz de los preceptos constitucionales y establecer las normas generales aplicables a situaciones concretas.*

### C. *La dignidad del marido engañado*

Transcurridos los tres (3) meses desde que se inscribe el nacimiento del hijo matrimonial estando el marido en Puerto Rico o cuando transcurren seis (6) meses desde que éste conoce del nacimiento de dicho niño si está fuera de Puerto Rico, se consolida la presunción de ley y caduca el plazo para instar la acción de impugnación de paternidad. Aduce el marido en autos que negarle al marido la búsqueda de la verdad sobre la filiación de su presunto hijo e imponerle una paternidad ficticia viola su dignidad de ser humano. Const. E.L.A., *supra*, Sec. 1.

 Sin duda alguna la ley (Art. 117 del Código Civil) violaría la dignidad del marido si automáticamente con el nacimiento del hijo se le imputara la paternidad. Se produciría la partenogénesis jurídica masculina proscrita en *Ocasio v. Díaz*, supra, al imputársele una paternidad que puede ser falsa.

Pero eso no es lo que dispone la ley bajo ninguno de los

supuestos analizados anteriormente. Al marido se le reconoce un término para impugnar la presunción de la paternidad. Claro está, la necesidad de la certeza y de la estabilidad en el *status* filiatorio de los hijos y la estabilidad en las relaciones de estado impiden que se deje al arbitrio del marido el momento para iniciar el cómputo del término. Las experiencias históricas, además, así lo aconsejan.

Pero además, nuestro ordenamiento jurídico le reconoce a aquél —cuyo interés pretende tutelar el breve término de caducidad de la acción de impugnación de paternidad del marido (al hijo)— la facultad de buscar su verdadera filiación, aunque incidentalmente impugne la paternidad del marido. *Agosto v. Javierre*, supra. Éste puede ejercitar su acción, para buscar su verdadera filiación durante unos términos amplios. Art. 216 del Código Civil, *supra*.

 Ante esta diversidad de remedios, no se puede sostener que la ley le impone al marido, arbitrariamente, un hijo.

Ante esta amalgama de remedios no se puede sostener que la dignidad del marido burlado quede violada por la ley.

Por ello debemos concluir que los términos dispuestos en el Art. 117 del Código Civil, *supra*, para instar la acción de impugnación de la presunción de paternidad legítima no violan la dignidad del marido.

## VIII

Aplicamos lo aquí resuelto a los hechos en autos.

Aquí el recurrente y su esposa inscribieron conjuntamente en 1981 el nacimiento del niño, cuya paternidad se impugna. No es sino hasta el 20 de septiembre de 1983 que inicia la acción de impugnación. El recurrente se hallaba en Puerto Rico al momento del nacimiento. El término de

tres (3) meses que tenía para impugnar comenzó a correr desde enero de 1981.

Bajo tales circunstancias su acción de impugnación había caducado.

Por lo tanto, actuó correctamente el foro de instancia al ordenar el archivo de la acción de impugnación de paternidad legítima. Por ello, *se dictará sentencia que confirme la del foro de instancia.*

El Juez Asociado Señor Negrón García concurre sin opinión escrita.