Estado Libre Asociado de Puerto Rico
PANEL I

| | | |
|---|---|---|
| EMMANUEL RIVERA RODRÍGUEZ<br><br>Demandante-Apelante<br><br>v.<br><br>FRANCHESKA MARIE VÉLEZ SEPÚLVEDA<br><br>Demandada-Apelada | KLAN202400711 | Apelación procedente del Tribunal de Primera Instancia, Sala de Familia y Menores de Bayamón<br><br>Caso Núm.: BY2023RF01719<br><br>Sobre: Impugnación de Paternidad |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Rodríguez Flores.

Sánchez Ramos Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 31 de enero de 2025.

Luego de un juicio, el Tribunal de Primera Instancia ("TPI") declaró sin lugar una demanda sobre impugnación de paternidad. Según se explica en detalle a continuación, concluimos que procede la confirmación de la sentencia apelada, pues la prueba sustenta la conclusión del TPI en cuanto al punto de partida del término de caducidad para presentar la demanda.

I.

En septiembre de 2023, el Sr. Emmanuel Rivera Rodríguez (el "Demandante") presentó la acción de referencia, sobre impugnación de paternidad (la "Demanda"), contra la Sa. Francheska Marie Vélez Sepúlveda (la "Madre") "en representación del menor M.L.R.V." (el "Menor").

El Demandante alegó que, en el 2017, conoció a la Madre por medio de las redes sociales y tuvieron varios encuentros sexuales esporádicos. Aseveró que, en el 2018, la Madre le comunicó que estaba embarazada y que él era el padre. El Menor nació el 10 de

marzo de 2018 y, el 26 de marzo de 2018, el Demandante lo reconoció como hijo suyo.

El Demandante alegó que, en julio de 2023, vio en la red social *Facebook* una publicación del Sr. Chelito R. Santos (el "Tercero"), compañero consensual de la Madre, en la que mostraba una fotografía de dos niños, uno de los cuales era el Menor, con el siguiente mensaje: "No se imaginan la fuerza que me dan mis nenes. Papá es un guerrero por ustedes". El Demandante alegó a raíz de ello comenzó a sospechar de la verdadera paternidad del Menor. Expuso que, ante la duda creada, en agosto de 2023, se realizó dos pruebas de paternidad que arrojaron un resultado genético negativo.

El Demandante solicitó al TPI que se enmendara el certificado de nacimiento del Menor en el Registro Demográfico con la información pertinente y se ordenara la devolución o reembolso de la pensión alimentaria pagada. Además, solicitó daños y perjuicios por $25,000.00.

Al contestar la Demanda, la Madre planteó como defensa afirmativa que la causa de acción había caducado.

Luego varios otros trámites, el 1 y 7 de mayo de 2024, se celebró el juicio en su fondo en el cual declararon el Demandante y la Madre; además, se presentó la siguiente prueba documental:

**Prueba documental - Sr. Rivera:**

Identificación 1 y Exhibit 1 (con objeción de la Sra. Vélez) – fotografía.

Identificación 2 y Exhibit 2 (con objeción de la Sra. Vélez) – DNA Paternity Test de Genetrace.

Identificación 3 y Exhibit 3 (con objeción de la Sra. Vélez) – rTest Report de International Medical Services.

Identificación 4 y Exhibit 4 – mensajes de textos de agosto de 2023.

**Prueba documental – Sra. Vélez:**

Identificación 1 - mensajes de textos de marzo de 2018

Exhibit 1 por estipulación – certificado de nacimiento del Menor.

Exhibit 2 – mensajes de textos de marzo de 2018.

Identificación 2 y Exhibit 3 (con objeción del Sr. Rivera – mensajes de textos de mayo de 2018.[1]

En cuanto a la prueba oral, surge de la Transcripción de la Prueba Oral (la "Transcripción") que los testigos declararon lo siguiente:

El **Demandante** declaró que conoció a la Madre por *Facebook*. Luego, intercambiaron números de teléfono y para el año 2017 tuvieron algunos encuentros sexuales, quedando embarazada la Madre.[2] El Menor nació el 10 de marzo de 2018 y el Demandante fue al hospital tras su nacimiento.[3] El Demandante aceptó que, el 26 de marzo de 2018, fue con la Madre a inscribir al Menor en el Registro Demográfico.[4]

Posteriormente, el Demandante se comunicaba con la Madre para ver al Menor. Iba a la casa de ella en Morovis para relacionarse con el niño y, cuando tenía 5 o 6 meses, comenzó a llevárselo los fines de semanas alternos de viernes a domingo. El Demandante recogía al Menor en la casa de la mamá de la Madre en Vega Baja.[5]

El Demandante declaró que, en el verano de 2023, por primera vez, tuvo dudas de la paternidad del Menor. Declaró que para el 7 de julio de 2023 vio en *Facebook* una publicación del Tercero, a quien había visto cuando iba a buscar al Menor. Era una foto de perfil del Menor y uno de los hijos de Chelito. Vio la imagen, tomó una foto con su teléfono y la guardó en un archivo en su teléfono.

---

[1] Apéndice del recurso, pág. 61 (*Minuta* del 1 de mayo de 2024).
[2] Transcripción del 1 de mayo de 2024, págs. 11-13.
[3] *Íd.*, pág. 15.
[4] *Íd.*, pág. 108.
[5] *Íd.*, págs. 16-17.

Su número de celular es el 787-308-1019. Explicó que, cuando vio la foto, se indignó porque pensaba que le estaban faltando el respeto o estaba pasando algo que él desconocía. Entendía que el mensaje que aparecía en la foto en *Facebook* era una alegación del Tercero sobre la paternidad del Menor que no le correspondía.[6] Como la publicación le creó duda sobre su paternidad del Menor, a principios de agosto de 2023, fue a un laboratorio para realizarse una prueba de paternidad. El laboratorio le envió el resultado por correo regular y correo electrónico.[7] El resultado de la prueba fue negativo.[8]

Posteriormente, el 25 de agosto de 2023, le notificó a la Madre por mensaje en *WhatsApp* el resultado de la prueba. La Madre rechazó dicho resultado, lo insultó y se mantuvo en que la llevara al Tribunal. En ese momento el Menor tenía 5 años y 5 meses.[9] Durante su testimonio, el Demandante leyó unos mensajes de texto de la Madre, de agosto de 2024 (Exhibit 4 de la parte demandante), que decían lo siguiente:

> A cinco años y cinco meses que [M.L.R.V.], mi hijo, como tú dices renegando de él, vienes con esa mierda, que no es tu hijo. ¿Tanto te pesa pagar pensión y ser responsable con él? Hace más de cinco años que tomé la pésima decisión de ser tu pareja y concederte el sueño de hacerte padre. Eres tan inmaduro o no sé si es que estas pasando por un estado sicótico ahora es que sales con tremenda estupidez. ¿Quieres prueba de paternidad? ¿Cuándo vamos? Porque yo más que nadie sé todos los resultados, ridículo. Tú y tu abogada perderán el tiempo. […].[10]
>
> […] yo voy al Tribunal en los diez días que según tú me estás dando a mí, para que vayas y exijas la prueba de paternidad, que yo estaré lista para ir al Tribunal. Debe caerte la cara de vergüenza con tanto daño que me hiciste hace años atrás viene con esta ridiculez. […].[11]

---

[6] *Íd.*, págs. 18-19, 25-26, 33 y 44.
[7] *Íd.*, págs. 48-51.
[8] *Íd.*, pág. 72.
[9] *Íd.*, págs. 85-86 y 89-93.
[10] *Íd.*, págs. 90-91.
[11] *Íd.*, pág. 92.

En el contrainterrogatorio, se le preguntó al Demandante si con "hace años atrás" se refería que años atrás él le reclamó a la Madre que él no era el padre. El Demandante respondió que no. También se le preguntó si desde el 2018 le había preguntado a la Madre si él no era el padre. El Demandante respondió que no.[12] Se le preguntó si en más de una ocasión le había dicho a la Madre que fueran a hacerse una prueba de paternidad cundo el niño naciera porque él no era el padre, y el Demandante respondió que no.[13]

El Demandante aceptó que para los años 2017 y 2018 tenía servicio de mensajería de *WhatsApp* y se comunicaba por este medio con la Madre.[14] Al mostrársele el Exhibit 2 de la Madre (mensajes de textos de 25 de marzo de 2018), declaró que no recordaba haber compartido esos mensajes con la Madre. Dichos mensajes revelaban lo siguiente:

> "¿Es hijo mío?"
>
> "¿Quieres hacerle la prueba de ADN?"
>
> "¿Qué si es mío?"
>
> "¿Dime?"
>
> "¿Qué si es mío?"
>
> "Me estás preguntando si es tuyo, ¿quieres hacerle la prueba de ADN?"
>
> "Dime tú sí o no".
>
> "Diablo, te guillas"
>
> "Dime"[15]

En cuanto a unos mensajes del 6 de mayo de 2018 que indicaban que él sospechaba en ese momento no ser el padre del Menor, el Demandante declaró que no los reconocía. Dichos mensajes decían lo siguiente:

> No te negado ver al nene. Ayer venías y te encojonaste y no viniste. Entonces, ¿quién está

---

[12] *Íd.*, págs. 100-101.
[13] *Íd.*, pág. 102.
[14] *Íd.*
[15] *Íd.*, págs. 106-107.

mal? Ridículo. [M.L.R.V.] es tu hijo, yo no fui quien dijo 'Ah, sabrá Dios si ese hijo no es mío'. [...] Y si voy al Tribunal y voy a pedir la prueba de paternidad, y cuando salga positiva quiero ver tu cara por estar renegando a tu hijo único.

Te dije que ya me negaste el nene y esta es la tercera vez, pues okay, no soy padre de nuevo porque tienes un compromiso. Okay. O [M.L.R.V.] es el regalo de ese compromiso, te dije, lléváme... te dije llévame, te pido por favor, llévame al Tribunal.[16]

El Demandante negó rotundamente que, para el 25 de marzo de 2018, el número de teléfono 939-599-4782 fuese suyo. Sin embargo, el Demandante fue confrontado con un requerimiento de admisiones en el cual a esa pregunta respondió "No, a mi mejor recuerdo". También negó que, el 25 de marzo de 2018, hubiese intercambiado mensajes con la Madre por medio de la aplicación *WhatsApp* enlazada con el número de teléfono 939-599-4782.[17] Y negó que desde el 2018 estuviera cuestionando a la Sra. Vélez la legitimidad de la paternidad del Menor.[18]

En el redirecto, declaró que, de haberse enterado antes del verano de 2023 que el Menor no era su hijo, no habría podido establecer una relación de amor y reciprocidad filial con él.[19]

Por su parte, **la Madre** declaró que conoció al Demandante en abril de 2017 en *Facebook*. El Demandante se comunicó con ella por la aplicación *Messenger* y después conversaban por *WhatsApp* y por llamadas. Tuvieron una relación de pareja; él la visitaba en su apartamento en Morovis, salían al cine e iban a comer.[20]

Declaró que, el 17 de julio de 2017, se enteró que estaba embarazada por una prueba de sangre que se hizo en un laboratorio. Se lo informó al Demandante y luego a su familia. Declaró que el Demandante le dijo que estaba feliz porque iban a ser papás.[21]

---

[16] *Íd.*, págs. 115-116.
[17] *Íd.*, págs. 120-126.
[18] *Íd.*, pág. 128.
[19] *Íd.*, pág. 130.
[20] *Íd.*, pág. 140.
[21] *Íd.*, págs. 140-141 y 143.

Continuaron la relación luego de él saber que ella estaba embarazada y fueron juntos a un lugar para conocer el sexo del bebé. Luego, empezaron a tener diferencias. El Demandante terminó la relación y le dijo que estaba saliendo con otra persona, pero siguieron en comunicación por *WhatsApp*. La Madre le informaba de su embarazo y le enviaba los sonogramas que se hacía. Después que se dejaron, el Demandante le cuestionaba y le preguntaba si él era el papá. La Madre siempre le contestaba que sí.[22]

Al preguntársele a la Madre en cuántas ocasiones el Demandante le cuestionó la paternidad, ella respondió que en unas tres o cuatro ocasiones. El Demandante le preguntaba si ella estaba segura que él era el papá del Menor. Ella siempre le respondía que sí. Le hacía ese cuestionamiento porque ella vivía en Morovis y él en Carolina y no se veían todo el tiempo. Declaró que, como una semana después de que el Demandante le dijo que no quería continuar la relación con ella, fue que él empezó a cuestionarle su paternidad. El Demandante no le dio ninguna razón por la cual cuestionaba la paternidad.[23] El 10 de marzo de 2018, la Madre rompió fuente; llamó al Demandante para decirle que iba para el hospital, pero no lo consiguió. El Demandante llegó al hospital ese día y vio al Menor en el *nursery*.[24]

**La Madre declaró además que, para marzo de 2018, el número de celular del Demandante era 939-599-4782.** Intercambiaban mensajes en *WhatsApp* por medio de ese número. El 25 de marzo de 2018, se comunicaron por *WhatsApp* y tuvieron una discusión porque el Demandante le cuestionó la paternidad otra vez.[25] La Madre recibía los mensajes a su número de celular de ese

---

[22] *Íd.*, págs. 143-144.
[23] *Íd.*, pág. 146.
[24] *Íd.*, pág. 147.
[25] *Íd.*, págs. 147-148 y 150.

entonces, que era el 787-253-6018. Ese día, el Demandante le envió un mensaje y ella guardó la imagen en *Google photos*, que se guardan en la nube, a la que solo ella tenía acceso. La Madre era quien aparecía en la fotografía de fondo del mensaje; era una foto de cuando estaba embarazada.[26]

En el mensaje, el Demandante le cuestionó en varias ocasiones sobre su paternidad. Dichos mensajes indicaban lo siguiente: "¿Es hijo mío?" La Madre le respondió: "¿Quieres hacerle pruebas de ADN?" El Demandante le contestó: "¿Qué si es mío?" Ella le contestó: "¿Dime?" "¿Quieres hacerle pruebas de ADN?" Él le contestó: "¿Qué si es mío?" Ella le contestó: "Me preguntaste si es tuyo, ¿quieres hacerle pruebas de ADN?" Él vuelve y le contesta: "¿Dime tú sí o no?" A esto ella le respondió: "Diablo, te guillas". El Demandante terminó la conversación expresando: "Dime".[27] Este intercambio tiene fecha de domingo, 25 de marzo de 2018, ella tomó un *screen shot* a las 4:33pm, y aparece el número de teléfono 939-599-4782.[28] No obstante, al día siguiente, el Demandante la buscó y fueron al Registro Demográfico para inscribir al Menor.[29] El Demandante fue libre y voluntariamente.[30]

El 6 de mayo de 2018, tuvieron otra discusión sobre la paternidad mediante mensajes por *WhatsApp*.[31] Se presentó un mensaje de texto de *WhatsApp* (Exhibit 3 de la demandada), el cual la Madre capturó en la pantalla que decía:

> Yo no te negué ver el nene. Ayer venías y te encojonaste y no viniste entonces. ¿Quién está mal? Ridículo. [M.L.R.V.] es tu hijo, yo no fui quien dijo, 'Ah sabrá Dios si ese hijo no es mío'. Y si hice mi compromiso hoy porque quedaste en buscarlo ayer. Pero nada, cuando desee ver a su hijo pase en la semana, yo no se le estoy negando. Y sí, voy a ir al Tribunal y voy a pedir la prueba

---

[26] *Íd.*, págs. 155-157.
[27] *Íd.*, pág. 157.
[28] *Íd.*, pág. 158.
[29] *Íd.*, pág. 166.
[30] *Íd.*, págs. 167-169.
[31] *Íd.*, págs. 170-171.

de paternidad y cuando salga positiva quiero ver
tu cara por estar renegando de tu único hijo.[32]

La Madre explicó que le escribió ese mensaje al Demandante porque en varias ocasiones este le había dicho que no era el padre, que tenía dudas y que quería una prueba de ADN.[33] Declaró que eso ocurrió en otras ocasiones, antes y después del parto; desde el 2017 hasta el 2022.[34] El Demandante incluso le dijo que ella había sacado el nombre de Leunam del nombre de su pareja actual que se llama José Manuel y no por él.[35] Comenzó una relación con su pareja actual en el 2018.[36]

La Madre también declaró que, a pesar de los cuestionamientos, el Demandante se llevaba el Menor en fines de semanas alternos. Cuando el Menor estaba con ella, el Demandante le escribía y le preguntaba cómo estaba el Menor, y lo llamaba por teléfono. Incluso, en agosto de 2023, el Menor se había ido con el Demandante de vacaciones y, en otra ocasión, cuando tenía 2 o 3 años, lo llevó a Orlando.[37] Negó que el Demandante, por primera vez en el 2023, hubiese cuestionado la paternidad del Menor.[38]

En el contrainterrogatorio, la Madre declaró que, en el mensaje de texto de 25 de marzo de 2018 (Exhibit 2 de la demandada), no aparece el número de teléfono del Demandante. No podía decir con exactitud cuándo el Demandante le dijo que dudaba de su paternidad porque fueron varias veces. Declaró que fue a finales del 2017, principios del 2018.[39]

La Madre declaró que, el 25 de marzo de 2018, intercambiaron mensajes por *WhatsApp*. No presentó en el tribunal los otros mensajes que intercambiaron ese día porque no se referían al pleito,

---

[32] *Íd.*, págs. 182-183.
[33] *Íd.*, pág. 184.
[34] *Íd.*, págs. 185-186.
[35] *Íd.*, pág. 186.
[36] *Íd.*
[37] *Íd.*, págs. 187-188.
[38] *Íd.*, págs. 188-189.
[39] *Íd.*, págs. 195-197, 209 y 211-212.

sólo el documento al que le hizo *screen shoot*. Del mensaje que presentó en evidencia no surge si ella le contestó al Demandante si el Menor era su hijo o no.[40] Además, declaró que conoce el resultado de las pruebas de paternidad y que éstas determinan que el Demandante no es el padre del Menor.[41]

A preguntas de la representación legal del Demandante, la Madre declaró que no recordaba que, al contestar la Demanda, hubiese alegado que el Demandante no se relacionaba con el Menor. En cambio, indicó que el Demandante siempre había compartido con el Menor.[42]

En cuanto al Exhibit 2, la Madre explicó que la hora 11:26 que aparece en el documento fue cuando hizo el *screenshot* y que las 4:33pm fue la hora en que tomó la foto para enviársela a su abogado. En la primera página del documento no aparece el número de teléfono del Demandante.[43]

Sobre el mensaje que el Demandante le envió el 25 de agosto de 2023, la Madre explicó que los 5 años y 5 meses se refiere a la edad del Menor y no al tiempo transcurrido.[44]

En el redirecto, la Madre explicó que, en el mensaje del 25 de agosto de 2018 (Exhibit 2), no aparecía el número de teléfono porque lo tenía guardado en *WhatsApp* bajo el nombre Emmanuel. En el mensaje del 6 de mayo de 2018 (Exhibit 3) aparecía el número de teléfono 939-599-4782, que era el número del Demandante.[45]

La Madre declaró que, a la semana siguiente de haber terminado la relación, el Demandante empezó a preguntarle si él era el padre del Menor. La relación la terminaron en el último trimestre de su embarazo; enero, febrero y marzo de 2018. Luego, indicó que

---

[40] *Íd.*, págs. 200-201.
[41] *Íd.*, pág. 203.
[42] TPO del 7 de mayo de 2024, pág. 24.
[43] *Íd.*, págs. 36-37 y 40-41.
[44] *Íd.*, págs. 44 y 46.
[45] *Íd.*, págs. 53-57.

el Demandante le había hechos cuestionamientos sobre la paternidad desde el 2018.[46]

Examinada la prueba oral y documental presentada en el caso, el 28 de mayo de 2024, el TPI notificó una *Sentencia* (la "Sentencia") mediante la cual desestimó la Demanda por caducidad. El 12 de junio, el Padre solicitó la reconsideración de la Sentencia, lo cual fue denegado por el TPI mediante una Resolución notificada el 26 de junio.

Inconforme, el 29 de julio (primer día laborable en el Poder Judicial luego del 24 de julio), el Demandante presentó la apelación que nos ocupa; plantea que el TPI cometió los siguientes errores:

1. Erró el Tribunal de Primera Instancia al desestimar la demanda de impugnación de paternidad por caducidad al resolver que el apelante había interpuesto luego de que hubiera transcurrido el plazo dispuesto en ley para ejercer la acción.

2. La decisión del foro primario de que el apelante no promovió la causa de acción de impugnación de paternidad dentro del término dispuesto en ley es errada como cuestión de derecho ya que la prueba no estableció que con anterioridad al mes de agosto de 2023, cuando el apelante tuvo conocimiento de que el menor no era hijo suyo mediante dos pruebas de histocompatibilidad, en qué efectivamente consistían el conocimiento de la inexactitud de la filiación y los indicios que le crearon duda verdadera. Además, el foro de instancia resolvió el caso bajo las disposiciones del artículo 575 del Código Civil de 2020, 31 LPRA sec. 7129, a pesar de que el menor nació en el año 2018 y para esa fecha estaba en vigor el artículo 117 del Código Civil de 1930, 31 LPRA sec. 465, según enmendado por la Ley Núm. 215 de 29 de diciembre de 2009.

Luego de varios trámites ante este foro revisor, dimos por estipulada la transcripción sometida por el Demandante el 29 de julio de 2024. El 28 de octubre, el Demandante presentó su alegato

---

[46] *Íd.*, págs. 58, 61-62 y 64-65.

suplementario.  La Madre no presentó alegato en oposición en el término concedido.  Resolvemos.

## II.

Aunque el concepto de filiación no está relacionado con el hecho biológico, se favorece la correlación entre la realidad biológica y la jurídica. *Sánchez Rivera v. Malavé Rivera,* 192 DPR 854, 863 (2015).  La filiación se puede establecer por la vía matrimonial y la extramatrimonial. *Vázquez Vélez v. Caro Moreno,* 182 DPR 803, 810 (2011).

Ahora bien, el estado filiatorio de una persona se puede rebatir mediante una acción judicial de impugnación de filiación. *Álvareztorre Muñiz v. Sorani Jiménez,* 175 DPR 398, 414 (2009).  En concreto, el ataque a la filiación matrimonial se realiza a través de una acción de impugnación de paternidad, mientras que el rechazo a la filiación extramatrimonial se tramita mediante una acción de impugnación de reconocimiento. *Vázquez Vélez,* 182 DPR a la pág. 812.

En lo pertinente, el Artículo 117 del Código Civil, según enmendado por la Ley Núm. 215-2009 ("Ley 215"), estableció cuándo debe ejercitarse la acción para impugnar al disponer que:

> La acción para impugnar la presunción de paternidad o de maternidad, por parte del padre legal deberá ejercitarse **dentro del plazo de caducidad de seis meses, contados a partir de la fecha de que advenga en conocimiento de la inexactitud de la filiación** o a partir de la aprobación de esta Ley, lo que sea mayor. (Énfasis suplido).

Por su parte, el Artículo 575 del Código Civil de 2020, 31 LPRA sec. 7129, establece que: "[l]a acción para impugnar la paternidad o la maternidad caduca al año **desde que el impugnador tiene indicios o conoce hechos que crean una duda verdadera sobre la inexactitud de la filiación**." (Énfasis suplido).

Así, "[p]ara que una acción de impugnación prospere es necesario que la acción se presente oportunamente y que esté basada en alegaciones específicas que, tomándolas como ciertas, demuestren a satisfacción del juzgador que existe una duda real sobre la exactitud de la filiación". *Rivera Marrero v. Santiago Martínez*, 203 DPR 462 (2019); *Mayol v. Torres*, 164 DPR 517, 554 (2005).

Nótese que el término concedido para interponer una acción de impugnación de filiación sea de paternidad o de reconocimiento, es de caducidad. Ello significa que el plazo disponible no se puede interrumpir o suspender, contrario a lo que ocurre con los términos de prescripción. Por consiguiente, el derecho a la causa de acción se extingue con el mero transcurso del tiempo. *Vázquez Vélez,* 182 DPR a la pág. 813. Así que, si la acción de impugnación no es promovida en el plazo fijado en ley, el estado filiatorio adviene final, aunque la realidad biológica no coincida con la jurídica. *Rivera Marrero*, 203 DPR a las págs. 478-479; *Sánchez Rivera*, 192 DPR a la pág. 867; *Calo Morales v. Cartagena Calo,* 129 DPR 102, 122-123 (1991). Con ello, se pretende evitar la incertidumbre y promover la estabilidad jurídica de la relación filiatoria. *Rivera Marrero*, 203 DPR a la pág. 478.

Por último, el Artículo 1814 del Código Civil de 2020, 31 LPRA sec. 11719, establece que:

> Los términos prescriptivos, de caducidad o de usucapión que estén transcurriendo en el momento en que este Código entre en vigor, tienen la duración dispuesta en la legislación anterior; pero si el término queda interrumpido después de la entrada en vigor de este Código, su duración será la determinada en este.

III.

Al ejercer nuestra función revisora, le debemos gran respeto y deferencia a las determinaciones de hechos que hace el juzgador de hechos, en particular a aquellas que descansan sobre su

apreciación de la credibilidad de testigos. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770-772 (2013); *González Hernández v. González Hernández*, 181 DPR 746, 776-777 (2011). Es dicho juzgador (en este caso, el TPI) quien está en mejor posición para evaluar la prueba, ya que tiene la oportunidad de escuchar a los testigos mientras declaran y de observar su comportamiento. *Íd*; *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67 (2009); *López v. Dr. Cañizares*, 163 DPR 119, 135 (2004).

Los tribunales apelativos no debemos intervenir con la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos de los tribunales de primera instancia. *E.L.A. v. S.L.G. Negrón-Rodríguez*, 184 DPR 464, 486 (2012); *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007). Los foros apelativos solo podemos intervenir con la apreciación de la prueba oral que haga el juzgador de los hechos cuando éste haya actuado con pasión, prejuicio o parcialidad, o haya incurrido en un claro error al aquilatarla. *Dávila Nieves*, 187 DPR a la pág. 771; *González Hernández*, 181 DPR a las págs. 776-777; *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 916 (2011); *Meléndez v. Caribbean Int'l. News*, 151 DPR 649, 664 (2000). Se podrá intervenir cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico de la totalidad de la prueba y cuando la apreciación de la misma se distancia "de la realidad fáctica o sea inherentemente imposible o increíble". *Pueblo v. Santiago et al.*, 176 DPR 133, 148 (2009). Se exceptúan de la regla de deferencia las determinaciones de hechos que se apoyan exclusivamente en prueba documental o pericial, ya que los tribunales apelativos están en idéntica posición que el tribunal inferior al examinar ese tipo de prueba. *González Hernández*, 181 DPR a la pág. 777.

## IV.

Examinada la totalidad del récord, incluida la transcripción de la prueba oral, concluimos que la determinación del TPI se sostiene adecuadamente por la prueba presentada. La apreciación de la prueba que hizo el TPI está enmarcada en los márgenes de la sana discreción judicial y, al no acusar algún claro error, no procede nuestra intervención con la misma.

Contrario a lo que plantea el Demandante, el término para impugnar el reconocimiento voluntario de un(a) hijo(a) puede comenzar a transcurrir aunque la parte no tenga certeza de que el (o la) hijo(a) no es suyo(a). Ni bajo el lenguaje utilizado en la Ley 215, ni bajo el lenguaje utilizado en el Código civil de 2020, es necesario que el presunto padre tenga seguridad sobre el asunto antes de que el término comience a transcurrir. La interpretación más razonable de la Ley 215 es que el término comienza cuando la persona tiene conocimiento de algún hecho que le sugiera que no es el padre, tal como se dispuso explícitamente en el Código civil de 2020.

La interpretación propuesta por el Demandante conduciría al resultado absurdo de que el término solo comenzaría a transcurrir cuando se obtiene la prueba científica que demuestre la ausencia de paternidad. Después de todo, es solo así que se tendría conocimiento cierto sobre una "inexactitud". Sin embargo, esta interpretación iría en contra del principio general que exige diligencia cuando una persona tiene razón para pensar que podría ser acreedora de un derecho y también de la fuerte política pública a favor de la estabilidad en las relaciones paterno filiales. Así pues, el lenguaje estatutario pertinente, a la luz de todo lo anterior, no respalda la atrevida interpretación propuesta por el Demandante.

En este caso, la prueba claramente le permitía al TPI determinar, como lo hizo, que el Demandante, desde el 2018,

conocía hechos que le causaron duda sobre su paternidad. En términos generales, este tipo de duda puede surgir por un sinnúmero de hechos (por ejemplo, la apariencia física del menor, sospechas sobre otras relaciones de la madre, la ausencia de relaciones del "padre" con la madre durante el periodo de concepción, la conducta de la madre o de terceros al respecto, etc.).

En cualquier caso, aquí la prueba apoya la conclusión de que, sobre la base de una o más de estas circunstancias conocidas por el Demandante, desde antes incluso que el Menor naciera, y poco después del nacimiento también, el Demandante tenía duda sobre su paternidad, la cual le comunicó en varias ocasiones a la Madre.

En efecto, la Madre declaró que el Demandante, desde temprano en el 2018, le manifestó dudas sobre su paternidad. El TPI podía razonablemente otorgarle credibilidad a este testimonio, más aún a la luz de la prueba documental admitida sobre las comunicaciones escritas entre las partes durante ese año. La Madre fue clara y precisa en cuanto a los mensajes que intercambió con el Demandante por *WhatsApp*. Por ejemplo, declaró que el 25 de marzo de 2018, el Demandante le cuestionó: "¿Es hijo mío?", "¿Que si es mío?, y "¿Dime tú sí o no?". Incluso, la Madre llegó a proponerle: "¿Quieres hacerle pruebas de ADN?". Una copia de este mensaje fue admitida como evidencia.

En fin, de la totalidad de la prueba, el TPI podía concluir, como lo hizo, que desde el 2018 el Demandante conocía hechos que le llevaron a dudar sobe la paternidad del Menor. Así pues, al momento de presentarse la Demanda aproximadamente cinco años luego (en septiembre de 2023), ya había caducado el término aplicable.

Subrayamos, no obstante, que el Menor permanece libre para, si así lo estima conveniente, instar una acción judicial para cambiar su filiación. Como bien consignó el TPI, "una cosa es lo que

establece el derecho" y otra cosa es lo que es "moralmente …

correcto". El récord sugiere que el Tercero, además de ser el padre

biológico del Menor, se ha relacionado de forma sustancial con este.

Por tanto, exhortamos a la Madre a que, en atención a esta

circunstancia, y tomando en consideración cualquier otra que

resulte pertinente, pondere con detenimiento si el mejor interés del

Menor radica en mantener su presente filiación o si, por el contrario,

debe instar la acción correspondiente de filiación, en representación

del Menor.

V.

Por los fundamentos expresados, se confirma la sentencia

dictamen apelada.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del

Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís<br>Secretaria del Tribunal de Apelaciones